ROSEMARY LEDET, Judge.
| iThis is a criminal appeal. The defendant, Jimil Joyner, appeals his conviction and sentence for attempted first degree murder of a police officer. For the reasons that follow, we affirm.

STATEMENT OF THE CASE

On February 2, 2007, Mr. Joyner and Vincent Walker were jointly charged by bill of information with two counts of attempted first degree murder of a police officer, violations of La. R.S. 14:(27)30. Count One pertained to New Orleans Police Department (“NOPD”) Officer Kevin Thomas; Count Two pertained to NOPD Officer John Mitchell.[1] In July 2009, the trial court denied Mr. Joyner’s motion to suppress the evidence and found probable cause.
In January 2010, a twelve-person jury jointly tried Mr. Joyner and Mr. Walker. The jury found Mr. Walker not guilty on *679 both counts. Although the jury found Mr. Joyner not guilty on Count Two (pertaining to Officer Mitchell), the jury found him guilty on Count One (pertaining to Officer Thomas). In February |⅞2011, the trial court denied Mr. Joyner’s motion for new trial. In March 2011, the trial court sentenced Mr. Joyner to thirty-five years at hard labor, without benefit of parole, probation or suspension of sentence. Mr. Joyner’s motion to reconsider sentence was denied. He now appeals his conviction.

STATEMENT OF THE FACTS

This case arises out of the shooting of NOPD Officer Thomas. The shooting occurred on August 30, 2005, the day after Hurricane Katrina made landfall in the New Orleans metropolitan area. The shooting occurred at the Chevron convenience store/gas station located at the corner of General DeGaulle Avenue and Wall Boulevard in Algiers (the “Chevron Store”). On the day of the shooting, NOPD Officers Mitchell and Thomas were assigned to ride together and to patrol the Algiers area. Both officers were attired in uniform shirts and blue jeans. Both officers were armed with two firearms — their police issued one and a personal one.
At around 3:30 p.m. that day, the officers observed a broken front glass window on the Chevron Store. When they pulled into the Chevron Store parking lot to investigate, a man walked out of the store carrying some property. When he saw the officers, the man put the property on the ground and ran. Two more men and a woman were also present at the Chevron Store. The officers filled out a field information card (“FIC”) on each of those three individuals and ultimately released them.
According to Officer Thomas, as the officers were completing the FIC on each of these individuals, the female told the officers that four black men with guns |shad been robbing people all morning at the gas station. Officer Thomas testified that as his partner filled out an FIC card, four men approached. (These four men were later identified as Mr. Joyner, Mr. Walker, Sye Carter, and Montanez Thomas.) At this point, the same female whispered to Officer Thomas that these men were the individuals who had been robbing people all morning. Officer Thomas immediately approached the four men and began conducting a pat-down search.
Officer Thomas explained that Mr. Joyner was the last of the four men in line to be patted down. He first patted down Mr. Thomas and then patted down Mr. Walker. As he approached Mr. Walker, Officer Thomas testified that the person at the end, Mr. Joyner, gave him nothing but static. He said that Mr. Joyner was uncooperative and felt the officer was harassing him. Officer Thomas tried to explain to Mr. Joyner that he had every reason to stop him; he indicated that he and Mr. Joyner went back and forth. Officer Thomas testified that as he was patting down Mr. Walker, Mr. Joyner was talking steadily. Mr. Walker told Mr. Joyner to calm down and let Officer Thomas finish what he was doing. Officer Thomas then moved to pat down Mr. Carter. As he was patting down Mr. Carter, Mr. Joyner shot him in the head. Officer Thomas said that he turned to see Mr. Joyner lowering his gun and then take off running. He said that he was a foot or two away from Mr. Joyner when Mr. Joyner shot him in the head. At no time had he drawn his weapon, either before approaching the four men or while dealing with Mr. Walker or Mr. Thomas. Officer Thomas testified that Mr. Walker and Mr. Joyner |4were the only ones who said anything and that Mr. Walker tried to calm Mr. Joyner down. Officer Thomas further testified that the principal reason he was able to remember *680 Mr. Joyner was because he was the only one of the men who gave him any trouble.
Officer Thomas, on cross examination, confirmed that he neither found a gun on Mr. Walker, nor saw one in his hand. He also confirmed that Mr. Walker never talked back to him, but simply tried to calm Mr. Joyner down. He testified that he had no recollection of anything after seeing Mr. Joyner lower the gun and run off. He said he could not move at that time. Also on cross examination Officer Thomas acknowledged that he probably said a few words when Mr. Joyner was mouthing off to him; however, he did not recall pushing Mr. Joyner back at any point. He did not see where Mr. Joyner pulled the gun from. During the investigation, he did not give a statement to either Lieutenant Austin or Detective Harbin. He did not recall talking to Detective Harbin over the telephone on December 2, 2005. He was never shown a lineup to identify who shot him.
Officer Mitchell testified that after he and his partner, Officer Thomas, completed the FIC for each of the three individuals initially at the Chevron Store, he notified Officer Thomas that he was entering the store to check if anyone else was inside. He estimated that he was inside the store for only a couple of seconds. As he was exiting the Chevron Store, Officer Mitchell heard yelling outside and then a gunshot. He observed a man wrestling with Officer Thomas (he later | ^identified the man as Mr. Walker) and fighting to. get Officer Thomas’s long gun. (Officer Thomas had a long assault-type weapon that was strapped on him.)
As Officer Mitchell approached Officer Thomas to assist him, a bullet whizzed past his head. Officer Mitchell returned fire at the person who was shooting at him and then went to assist Officer Thomas. The whizzing bullet drew his attention to the shooter. Officer Mitchell identified Mr. Carter as the shooter. After the exchange of gunshots, Mr. Walker stopped wrestling with Officer Thomas; and two of the four men — Mr. Carter and Mr. Joyner — fled the scene. When Officer Mitchell approached Officer Thomas, Mr. Walker immediately got on his knees and put his hands up in the air. At that point, Mr. Walker had been shot in the shoulder.[2] Officer Mitchell then put down one of his guns — he had one in each hand — to use Officer Thomas’s radio to radio for help. (Officer Mitchell’s own radio was broken.) At that point, the two other men — Mr. Walker and Mr. Thomas, who was by the Chevron Store’s carwash — fled the scene. When Sergeant Anderson arrived on the scene, Officer Mitchell gave him a description of the direction in which the suspects had fled. Sergeant Anderson then radioed that information.
Shortly after the suspects fled, they were apprehended on Wabash Street where Mr. Joyner lived; this location was within walking distance of the Chevron Store (the “Secondary Scene”). At that location, Officer Mitchell participated in identification procedures with, among others, Lieutenant Robert Italiano. | (According to Officer Mitchell, he identified Mr. Carter as the person who shot at him. The physical description of Mr. Carter included that he had really big ears.
At trial, Officer Mitchell identified, using a crime scene photograph, where the four men were located and what they were doing. According to Officer Mitchell, Mr. Walker was the man who was wrestling *681 with Officer Thomas. Mr. Thomas was the man who was standing by the car wash. Mr. Carter was the man who shot at him. Mr. Joyner “was on the scene and fled” from the scene with Mr. Carter. When asked where Mr. Joyner was located, Officer Mitchell stated that Mr. Joyner “came into vision after they started running.” He acknowledged that he never saw Mr. Joyner do anything other than run away and that he never saw Mr. Joyner with a gun.[3]
When asked which of the four men he had seen with guns, Officer Mitchell answered only Mr. Carter. Officer Mitchell confirmed that Mr. Carter was the only one of the four men that he saw that day with a gun, that Mr. Carter was the only one who fired a gun at him, and that he did not see anyone else shoot. He, however, acknowledged that he had no knowledge of who fired the first shot he heard when he was exiting the Chevron Store and that he did not see who shot Officer Thomas. He did not know whether Officer Thomas had fired his weapon.
Detective Greg Joerger, a Jefferson Parish Sheriffs Office (“JPSO”) criminal investigator, testified that on August 30, 2005, he responded to a radio dispatch that originated from the Chevron Store, which was located near the |7Orleans-Jefferson Parish line. At that time, he was located two blocks away. When Detective Joerger arrived on the scene, he suggested that Officer Mitchell remain with Officer Thomas. Detective Joerger took off on foot after the four suspects. Detective Joerger and other officers observed Mr. Walker and Mr. Joyner inside of a white, four-door BMW (the “BMW”) that had just begun to move.[4] They stopped the vehicle, ordered the occupants to exit with their hands up and to get in a prone position. The officers also observed a gun on the rear seat of the BMW in which the two men had been sitting.
Detective Joerger testified that Mr. Joyner exited and got on his knees, but not on the ground as ordered to by the officers. Mr. Joyner refused to comply with several more loud commands to get on the ground. According to Detective Joerger, Mr. Joyner then reached for the rear of his waistband. Detective Joerger testified that before reaching for his waistband, Mr. Joyner stated that he killed one officer and that he was going to kill another because he was a “soldier.” At that point, Detective Joerger observed the butt of a handgun and used his Taser on Mr. Joyner. Although he shot two rounds with his Taser, he only hit him with one dart (prong). For this reason, another officer also shot Mr. Joyner with his Taser. At that point, Mr. Joyner fell to the ground and was handcuffed. The handgun in Mr. Joyner’s waistband fell out when he was being shot with the Taser. Detective Joerger replied in the negative when asked whether, at any point, Mr. Joyner had [«attempted to shoot him. Once the scene was secured and everyone was handcuffed, Detective Joerger had no further involvement in the case.
St. Charles Parish Detective Darren Gros testified that in August 2005 he was employed by the JPSO in a one-man patrol unit. He was two blocks away when the officer shot dispatch call came over the radio from Orleans Parish. He arrived at the scene immediately after Detective Joerger. He, along with other officers, ran across some yards and came out onto *682 Wabash Street. On Wabash Street, they observed the occupants of the BMW attempting to flee. Detective Gros testified that Mr. Joyner resisted loud verbal commands from several officers to get out of the driver’s seat. Although Mr. Joyner did go to his knees, he attempted to get up and to reach for a weapon. Consistent with Detective Joerger’s testimony, Detective Gros testified that Detective Joerger shot Mr. Joyner with the Taser and hit him once. Detective Gros then successfully fired his Taser at Mr. Joyner. Detective Gros testified that he heard Mr. Joyner state that he was a soldier.[5]
Former NOPD Lieutenant Italiano testified that on August 30, 2005, he too responded to the officer shot dispatch call. When he arrived, he found Officer Thomas in an emergency unit and Officer Mitchell on the scene. Lieutenant Italiano testified that Officer Mitchell identified Mr. Walker and Mr. Joyner at the Secondary Scene. According to Lieutenant Italiano, Officer Mitchell told him that all four male subjects at the Chevron Store were armed, that Mr. Joyner fired a shot 19at him, and that he believed that Mr. Joyner was the one who fired the shot that hit Officer Thomas.[6]
On cross examination, Lieutenant Itali-ano confirmed that when he relocated to the Chevron Store he assumed control of the crime scene as the ranking officer present. Eventually, Lieutenant Fred Austin assumed control of the investigation. When asked whether he believed Officer Mitchell’s trial testimony that Mr. Carter was the shooter, Lieutenant Itali-ano replied in the negative. Lieutenant Italiano did not speak with Officer Thomas on the day of the shooting.
JPSO Deputy Michael Aicklen, who was assigned to the crime scene unit, testified that he processed the scene of the shooting. It was stipulated that the seventy-three photographs the State introduced depicted the crime scene. Deputy Aicklen identified photographs depicting both 9 mm and .45 auto caliber spent cartridge casings.
NOPD Officer Michael Thomassie arrived on the crime scene and participated in the search for the suspects on foot. He observed three suspects entering the back door of a residence. One of those suspects darted from a backyard shed in the 2600 block of Amazon Street, which is one street over from Wabash Street. Officer Thomassie entered the backyard shed and discovered a black bag with a handgun protruding from it; the black bag was lying on a piece of plywood on top of the rafters. The black bag contained more than one weapon. One of those weapons was a revolver, which did not have any spent cartridges in it. | inOfficer Thomas-sie advised the other officers that he had discovered weapons. He then retrieved the black bag. To secure the black bag, he placed it in the back of the BMW, which was parked in front of the Wabash Street residence, ie., at the Secondary Scene. Officer Thomassie admitted on cross examination that he did not see any of the three suspects place any type of weapon in the backyard shed. Officer Thomassie was never asked to make an identification of the suspects.
NOPD Homicide Detective Decynda Barnes testified that on the day of the shooting she went to both crime scenes. At the Secondary Scene, she interviewed Mr. Joyner’s grandmother, Irma Harris, at her Wabash Street residence. Ms. Harris *683 told her that when the men returned to the residence, someone yelled out her name and she went outside to see who it was. She said it was “Bo,” Mr. Walker, and that he was bleeding. When Ms. Harris asked Mr. Walker what happened, - he told her that he had been cut.
Afterward, Detective Barnes relocated to West Jefferson Hospital, where she advised Mr. Joyner of his rights.[7] He then told her that “he had been knowing the other individuals involved for a minute.” When recalled as a witness by the State, Detective Barnes testified that she also advised Mr. Thomas of his rights at West Jefferson Hospital and that he indicated that he understood those rights. Mr. Thomas then told her that he and some other individuals were at the Chevron Store and that he asked the officer if they could have some of the things from the store |1Tthat were on the ground. He also told her that the officer with the long gun — the officer who was shot — fired shots; however, he retracted that statement.
NOPD Homicide Detective Lieutenant Fred Austin arrived at the Chevron Store at about 5:00 p.m. (the incident began around 3:30 p.m. when Officer Thomas and Mitchell arrived at the Chevron Store). Lieutenant Austin interviewed Officer Mitchell and spoke with Lieutenant Itali-ano. Lieutenant Austin then relocated to the Secondary Scene, where he observed Mr. Joyner lying by the driver’s side door of the BMW -with a gun lying next to him. Mr. Joyner had been shot down by the JPSO deputies with a Taser. Three other men, who were handcuffed, were on the curb on the passenger side of the BMW.
Lieutenant Austin testified that four guns were recovered, three handguns and a shotgun. On cross examination, he testified that no fingerprints suitable for identification purposes were found on the guns. He testified that if there was a report reflecting that there were fingerprints suitable for identification he had never seen it. Lieutenant Austin said no gunshot residue tests were performed because such testing materials were unavailable. Lieutenant Austin admitted that no photograph identification procedure was ever employed to seek an identification of the shooter from Officer Thomas. He also admitted that Officer Thomas said he really did not remember anything.
On redirect examination, Lieutenant Austin testified that on the day of the shooting Officer Mitchell informed him that as he came out of the Chevron Store he heard a gunshot, at which time he saw Mr. Walker tackling Officer Thomas 112onto the ground. Simultaneously, he received gunfire from Mr. Joyner, who was in the “island” of the Chevron Store gas station. Officer Mitchell returned gunfire at Mr. Joyner. Mr. Walker then began to get up off of Officer Thomas and raised a gun towards Officer Mitchell. Officer Mitchell then shot Mr. Walker in his shoulder.
NOPD Homicide Detective Winston Harbin responded to the Secondary Scene and assisted the JPSO Crime Lab in photographing the scenes and collecting evidence. When recalled as a defense witness, Detective Harbin testified that on December 2, 2005, he telephoned Officer Thomas to ask him if he could identify the perpetrator. Officer Thomas told him that he could not do so. Detective Harbin did not recall talking to Officer Thomas after December 2, 2005. On cross examination, Detective Harbin testified that he recalled Officer Thomas mentioning a young guy who would not cooperate.
*684 Meredith Acosta, a JPSO Crime Lab employee since 2001, was qualified by stipulation to be a firearms examination expert. She identified her report reflecting her examination and testing of four firearms, cartridge cases, and some bullet fragments. The four firearms were a Glock Model 36, .45 auto caliber semiautomatic pistol (the “Glock”); a Rossi Model M685 .38 caliber revolver; a Bryco Arms Model Jennings 9 mm semiautomatic pistol; and a Mossberg Model 500A 12 gauge shotgun. Ms. Acosta was unable to test fire the Bryco Arms Jennings pistol because it was non-functional as received by the firearms unit. The five 9mm fired/ spent cartridge casings she tested had all been fired by the Intratec | iaModel Tech-9. This firearm was confirmed to be Officer Mitchell’s personal firearm that he was carrying that day in addition to his service weapon. It was also the firearm that he fired at Mr. Walker, striking him in the shoulder. Ms. Acosta stated, on cross examination, that she did not have any knowledge where the Intratec Tech-9 was seized, only that it had been given to her by Detective Harbin. Ms. Acosta determined that all seven of the spent/fired .45 auto caliber casings had been fired by the Glock, which she test-fired. She was unable to match the bullet fragments/copper jacket fragments recovered to any firearm recovered. Ms. Acosta confirmed, on cross examination, that none of the recovered evidence was linked to the .38 caliber Rossi revolver. She also confirmed that the Bryco Arms Jennings 9mm pistol was non-functional and could not be test fired.
Anna Duggar, Director of the NOPD Crime Lab, was qualified by stipulation as an expert in latent prints. She examined three handguns under the item number of the instant case: the Glock, a .38 caliber Rossi revolver, and a 9mm Bryco. She identified the three guns in evidence. Five potential latent prints were developed on the Bryco 9mm handgun and were sent on for possible comparison.
NOPD Officer George Jackson was qualified by stipulation as an expert in fingerprint examination and comparison. Officer Jackson testified that of the four prints sent to him, only one was suitable for identification. He compared that fingerprint to prints of Mr. Joyner, Mr. Walker, and Mr. Carter; and he determined that it did not match prints of any of these individuals. Officer Jackson stated on 114cross examination that, insofar as the accuracy of fingerprint comparison, it was one hundred percent accurate.[8]
Lionel Parker, a retired NOPD officer, testified that in October 2005, while a NOPD officer, he was assigned to the Bureau of Alcohol, Tobacco and Firearms. He traced the Mossberg 12 gauge shotgun to Mr. Joyner. He was unable to determine the owner of the Glock. The Rossi .38 caliber revolver and the Bryco Arms Model Jennings 9mm pistol were traced to third party purchasers unrelated to this case.
Dr. John Steck, the neurosurgeon who treated Officer Thomas, testified that Officer Thomas sustained a gunshot wound to his head, with an entry and an exit site. The bullet fractured the skull and drove *685 many of the skull fragments into the left frontal lobe and farther into the brain. The skull was opened and the fragments were removed; the brain membrane was repaired and multiple pieces of the fractured skull were fixed together with small screws and plates. No bullet or any type of metal object was recovered from Officer Thomas’s head. Dr. Steck confirmed that Officer Thomas’s breathing tube was removed on the day after surgery and that Officer Thomas was noted to be waking up and following commands. Dr. Steck testified, on cross examination, that Officer Thomas washable to speak and was clearly improving when Dr. Steck’s partner took over his care a few days after surgery.
Mr. Thomas, Mr. Joyner’s brother, was called as a defense witness. Mr. Thomas testified that on August 30, 2005, he was at Mr. Joyner’s Wabash Street residence. Three other people were present: Mr. Walker (Mr. Joyner’s uncle); Mr. Carter; and Irma Harris (Mr. Joyner’s grandmother). Mr. Thomas testified that they heard on the radio that they were giving out goods, mentioning specifically that they heard that the police were letting people take goods out of Walmart. At some point that day, they left the Wabash Street residence in Mr. Joyner’s truck and went to Walmart and various other places looking for goods; in particular, they were looking for food items. He acknowledged that he had no money. He was unaware of whether any of the other individuals he was with had weapons on them. Eventually that day they returned to the Wabash Street residence.
Later that day, Mr. Thomas was outside the Wabash Street residence and noticed Officer Thomas alone near the Chevron Store. He also observed some drink cans on the ground. Mr. Thomas and the other men then walked to the Chevron Store to ask the officer if they could have the cans. When they arrived at the store, they discovered that the cans on the ground were beer cans. Mr. Thomas testified that none of them drank beer. He also testified that there was also a woman present at the Chevron Store and that the woman asked Officer Thomas if she could have some of the beer. The officer told her that she could, she gathered the beer, and she walked away.
11fiWhen the men first encountered Officer Thomas, Mr. Thomas testified that the officer was getting irate. He explained that Officer Thomas continually was accusing the four men of planning to ransack and loot the Chevron Store and that he was disrespecting them. Officer Thomas then began patting down the four men. He was the first one in line to be patted down. Mr. Walker was second in line. At some point after he had finished patting down Mr. Walker, Officer Thomas pushed Mr. Joyner in his face, and Mr. Joyner fell back onto Mr. Carter. Officer Thomas then took a step towards Mr. Walker. As the officer was doing so, he was raising his long gun. At that point, Mr. Thomas testified that he ran. As he was running, he heard gunshots. He did not see Officer Mitchell anywhere in the area. He subsequently saw Officer Mitchell exit the Chevron Store and begin shooting towards a field on the other side of the Chevron Store; Mr. Joyner and Mr. Carter were running across that field. Previously, Mr. Thomas had observed Officer Thomas and Mr. Walker wrestling. When asked whether he or any of the other men had a gun when they approached Officer Thomas, Mr. Thomas replied in the negative. Mr. Thomas estimated that the entire incident lasted six to eight minutes.
According to Mr. Thomas, after the shooting stopped Officer Mitchell questioned him about what had happened. Mr. *686 Thomas told Officer Mitchell that his partner tried to kill them. Mr. Thomas said that he then told Mr. Walker that they had to get out of there. The men then proceeded to Mr. Joyner’s Wabash Street residence. At Mr. Joyner’s residence, Mr. Thomas gathered clothes and other things. Mr. Thomas, Mr. Joyner, and Mr. Walker got in the BMW and | )7attempted to flee. However, as they were leaving the house and taking a left turn, they encountered the police. The police removed them from the car. Mr. Thomas, however, testified that he could not comment on how the police got Mr. Joyner out of the vehicle. According to Mr. Thomas, he saw the police Taser Mr. Joyner after he was out of the car. He did not see Mr. Joyner resisting arrest. Mr. Thomas admitted having two prior felony convictions, for burglary and theft in Alabama, for which he received a two-year suspended sentence and three years of probation.
Irma Harris, Mr. Joyner’s grandmother, testified that since 2002 she had resided with Mr. Joyner at the Wabash Street residence. On August 30, 2005, she and Mr. Joyner were at the residence. Also present were Mr. Walker, Mr. Thomas, and Mr. Carter. After the hurricane passed, they left the residence to drive around and survey the damage in the community. When they returned, she took a shower. While she was in the shower, Mr. Carter came in the house through the front door. He was distraught and excited. He announced that they needed to take Mr. Walker to the hospital and that they wanted Ms. Harris to go with them. Mr. Joyner came in right after Mr. Carter; he also entered through the front door. Mr. Walker and Mr. Thomas came in almost simultaneously; Mr. Walker’s shoulder was bleeding. They all got into Ms. Harris’ vehicle, the BMW, and started to back out. As they did so, police came from all directions, surrounding the car and ordering them out. Ms. Harris estimated that twelve to fifteen police officers were present. She testified that no police officer told her that any weapons were found in the residence. At no time did Ms. Harris see Mr. Joyner with a gun. She knew that 11sMr. Joyner had a gun that he purchased for his twenty-fourth birthday, but she had never seen it and did not know what kind it was. She testified that Mr. Joyner had a clothing store that sold jeans, t-shirts, hats, and similar items. He was also a partner with someone in a business involving refurbishing cars they purchased at auction.
On cross examination, Ms. Harris testified that they had food and water in the house. On redirect examination, Ms. Harris was reminded of the prosecutor’s questions about having food and water. She replied in the negative when next asked whether, to her knowledge, Mr. Joyner or anyone else in the house had any reason to go looting that day.
It was stipulated that Deputy Kevin Murphy would testify that he collected the twenty-five articles listed in his crime scene report from the Secondary Scene and that he took photographs at both crime scenes. It also was stipulated that Captain Steven Gordon would testify that he could not fill the State’s request for the 911 and radio transmissions under the item number assigned to the incident, Item # K-1392305. As noted, the incident occurred the day after Hurricane Katrina made landfall when NOPD headquarters was evacuated.

DISCUSSION

ERRORS PATENT
A review of the record for errors patent reveals one. The record fails to reflect that Mr. Joyner was arraigned. The bill of information charging him was *687 filed on February 2, 2007, but he had been released from custody under La.C.Cr.P. 119art. 701. He was not taken into custody after being charged until approximately two years later, on February 20, 2009, when he was arrested on a capias. The governing procedural provision is La. C.Cr.P. art. 555, which provides that “[a] failure to arraign the defendant or the fact that he did not plead, is waived if the defendant enters upon the trial without objecting thereto, and it shall be considered as if he had pleaded not guilty.”
Although Mr. Joyner apparently was not arraigned, the record reflects that he entered upon the trial without objecting thereto. Accordingly, the error is harmless. State v. Foreman, 08-0902, p. 17 (La.App. 4 Cir. 4/29/09), 10 So.3d 1238, 1248 (failure to arraign a defendant on an amended bill of information — “the failure to arraign a defendant is harmless if the defendant goes to trial without objecting to the failure”)(citing La.C.Cr.P. art. 555); State v. LeBlanc, 03-0276, p. 5 (La.App. 4 Cir. 11/19/03), 862 So.2d 129, 132.
ASSIGNMENT OF ERROR NO. 3[9]
Mr. Joyner’s third assignment of error is that the evidence was insufficient to support his conviction. The well-settled standard of review for sufficiency of the evidence is set forth in State v. Huckabay, 00-1082, p. 32 (La.App. 4 Cir. 2/6/02), 809 So.2d 1093, 1111, as follows:
In evaluating whether evidence is constitutionally sufficient to support a conviction, an appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Green, 588 So.2d 757 (La.App. 4 Cir.1991). However, the reviewing court may not disregard this duty simply because the record contains evidence that tends to support each fact necessary to constitute the crime. State v. Mussall, 523 So.2d 1305 (La.1988). The reviewing court must consider the record as a whole since that is what a rational trier of fact would do. If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier’s view of all the evidence most favorable to the prosecution must be adopted. The fact finder’s discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law. Mussall; Green; supra. “[A] reviewing court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence.” State v. Smith, 600 So.2d 1319 (La.1992) at 1324.
In addition, when circumstantial evidence forms the basis of the conviction, such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Shapiro, 431 So.2d 372 (La.1982). The elements must be proven such that every reasonable hypothesis of innocence is excluded. La. R.S. 15:438. This is not a separate test from Jackson v. Virginia, supra, but rather an evidentiary guideline to facilitate appellate review of whether a rational juror could have found a defendant guilty beyond a reasonable doubt. State v. Wright, 445 So.2d 1198 (La. *688 1984). All evidence, direct and circumstantial, must meet the Jackson reasonable doubt standard. State v. Jacobs, 504 So.2d 817 (La.1987).
Id. (quoting State v. Ragas, 98-11, pp. 13-14 (La.App. 4 Cir. 7/28/99), 744 So.2d 99, 106-07); see also State v. Kirk, 11-1218, pp. 5-6 (La.App. 4 Cir. 8/8/12), 98 So.3d 934, 939.
The testimony of a single witness, if believed by the trier of fact, is sufficient to support a conviction. State v. Wells, 10-1338, p. 5 (La. 4 Cir. 3/30/11), 64 So.3d 303, 306. A fact finder’s decision concerning the credibility of a witness will not be disturbed unless it is clearly contrary to the evidence. State v. James, 09-1188, p. 4 (La.App. 4 Cir. 2/24/10), 32 So.3d 993, 996.
First degree murder is defined as including the killing of a human being when the offender has the specific intent to kill or inflict great bodily harm upon aj^peace officer engaged in the performance of his lawful duties or when the specific intent to kill or inflict great bodily harm is directly related to the victim’s status as a fireman, peace officer, or civilian employee. La. R.S. 14:30(A)(2). An attempt occurs when a person, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object; it is immaterial whether he would have actually accomplished his purpose. La. R.S. 14:27(A).
To prove attempted first degree murder, the State must prove that the defendant had the specific intent to kill (proof of specific intent to inflict great bodily harm will not suffice) and committed an overt act tending toward the accomplishment of that goal. See State v. Jefferson, 04-1960, p. 9 (La.App. 4 Cir. 12/21/05), 922 So.2d 577, 587 (attempted first degree murder of a police officer).
In the instant assignment of error, Mr. Joyner does not dispute that the person that shot Officer Thomas in the head had the specific intent to kill the officer who was engaged in the performance of his lawful duties. Thus, it is undisputed that an attempted first degree murder was perpetrated. Mr. Joyner does dispute whether the evidence was sufficient to prove identity — that that he was the person who committed the crime. When, as here, the key issue is the defendant’s identity as the perpetrator, rather than whether the crime was committed, the State is required to negate any reasonable probability of misidentification. State v. Weary, 03-3067, p. 18 (La.4/24/06), 931 So.2d 297, 311; State v. Neal, 00-0674, p. 11 (La.6/29/01), 796 So.2d 649, 658.
| ¾⅞As noted above, Officer Thomas testified at trial that he was in the process of patting down four men at the Chevron Store when Mr. Joyner shot him.[10] The last thing Officer Thomas remembered after being shot was seeing Mr. Joyner lower the gun and run off. Officer Thomas testified that the principal reason he was able to remember Mr. Joyner was because he was the only one who gave him any trouble. Mr. Joyner correctly points out that Officer Thomas’s partner that day, Officer Mitchell, testified that the only person he observed shoot a gun that day was Mr. Carter, who shot at him after he exited the Chevron Store. However, this was *689 after Officer Thomas had already been shot; and Officer Mitchell admitted that he did not see Officer Thomas get shot.
Lieutenant Italiano testified that Officer Mitchell identified Mr. Joyner and Mr. Walker at the Secondary Scene; that Officer Mitchell told him that all the subjects at the Chevron Store were armed; and that Officer Mitchell told him that Mr. Joyner fired a shot at him and that he believed that Mr. Joyner was the one who shot Officer Thomas. Likewise, Lieutenant Austin, the lead investigator in the case, testified that Officer Mitchell told him that he received gunfire from Mr. Joyner, who was in the island of the gas station at the Chevron Store, at which time he returned fire at Mr. Joyner. Lieutenant Austin further testified that Officer Mitchell told him that Mr. Walker, who had been wrestling with Officer Thomas, then began to get up off of Officer Thomas and raised a gun towards Officer | gjMitchell, at which time Officer Mitchell shot him in his shoulder. Lieutenant Austin replied in the affirmative when asked whether Officer Mitchell appeared certain of what he was telling Lieutenant Austin at that time; he replied in the negative when asked whether Officer Mitchell hesitated in identifying Mr. Joyner as the person who shot at him.
Mr. Joyner stresses that Lieutenant Austin testified that, at the time he spoke with Officer Thomas, Officer Thomas said he really did not remember anything. Similarly, Detective Harbin testified that he telephoned Officer Thomas on December 2, 2005, to ask Officer Thomas if he could identify the person who shot him; and his recollection was that Officer Thomas answered that he could not. Detective Harbin further testified that he recalled Officer Thomas mentioning a young guy who would not cooperate. This testimony regarding an uncooperative, young man was consistent with Officer Thomas’s testimony that Mr. Joyner, who was twenty-two years old at the time of the shooting, was the only one of the four men who gave him any trouble during the pat downs.
The physical evidence is that the 9mm caliber spent cartridge casings collected as evidence from the Chevron Store were fired from Officer Mitchell’s personal firearm (a 9mm Intratec Tech-9). The .45 auto caliber spent cartridge casings collected as evidence from the Chevron Store were fired from the Glock, which was recovered when it fell from Mr. Joyner’s waistband when he was apprehended. Officer Mitchell’s testimony was that he did not fire his personal ^firearm until after Officer Thomas had been shot; thus, he could not have shot his partner, Officer Thomas, accidentally.
The trial testimony establishes that Mr. Joyner was carrying the Glock on his person when he was taken out of the BMW by police at the Secondary Scene. Mr. Joyner had just fled from the Chevron Store (the scene of the shooting) to the Wabash Street residence where he lived with his grandmother, Ms. Harris (the Secondary Scene). Mr. Walker (who was bleeding from a gunshot wound in his shoulder inflicted by Officer Mitchell), Mr. Carter, and Mr. Thomas also fled the scene of the shooting to the Wabash Street residence. The four men informed Ms. Harris that they needed to get Mr. Walker to the hospital. They hurriedly left the residence, and got into the BMW, which belonged to Ms. Harris. However, they were prevented from leaving when JPSO deputies and NOPD officers surrounded the BMW.
The testimony of Detective Joerger and Detective Gros, both with the JPSO, was consistent. They testified that the officers stopped the BMW and ordered the occupants out. Mr. Joyner refused to comply *690 with loud commands to get on the ground; instead, he remained on his knees outside the car. After Mr. Joyner reached for the rear of his waistband, both JPSO detectives used their Taser on Mr. Joyner. The Glock in Mr. Joyner’s waistband fell out when he was being Tasered. Detective Joerger stated that before Mr. Joyner reached for his waistband, Mr. Joyner stated that he killed one officer and that he was going to kill another | ¡^because he was a “soldier.” Detective Gros testified that he heard Mr. Joyner say that he was a “soldier.”
Lieutenant Austin testified that when he relocated to the Secondary Scene he observed Mr. Joyner lying by the driver’s side door of the BMW with the Glock lying next to him. The JPSO deputies had Ta-sered Mr. Joyner. Four guns were recovered in the case; however, only one of them was linked to the shooting: the Glock found on Mr. Joyner.
Conflicting testimony was presented in this case regarding whether Mr. Joyner was armed at the Chevron Store and whether he was the one who fired shots at Officer Mitchell, shot Officer Thomas, or both. The conflict arises from Officer Mitchell’s trial testimony that Mr. Carter was the only individual that he saw with a gun at the Chevron Store and that Mr. Carter was the individual who shot at him and by implication shot Officer Thomas. Officer Thomas testified that Mr. Joyner shot him.
The physical evidence concerning which firearms were discharged at the Chevron Store that day establishes that only two guns were fired: (1) Officer Mitchell’s personal weapon (a 9mm caliber Tech-9); and (2) the Glock that was found on Mr. Joyner’s person. Not only was Mr. Joyner found in physical possession of the Glock, but also Mr. Joyner, at the time of his arrest, proclaimed to the arresting officers that he had killed one police officer and that he was going to kill another, because he was a “soldier.”
|2fiViewing all the evidence in a light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that Mr. Joyner knowingly and with specific intent to kill, shot Officer Thomas in the head with the Glock that was in his possession when apprehended by police shortly after the shooting. Thus, this assignment of error lacks merit.
ASSIGNMENT OF ERROR NO. 1
Mr. Joyner’s first assignment of error is that the trial court erred in allowing into evidence Lieutenant Italiano’s hearsay testimony without requiring the State to lay a proper foundation. Mr. Joyner argues that the State improperly sought to impeach Officer Mitchell’s trial testimony that Mr. Carter shot at him and that Mr. Carter was the only one of the four men he saw with a gun on the day of the shooting. Mr. Joyner argues that the State sought to do this by having Lieutenant Italiano testify that Officer Mitchell had told him on the day of the shooting that Mr. Joyner had shot at him. Mr. Joyner argues that the State could have properly impeached Officer Mitchell by offering Lieutenant Itali-ano’s testimony as nonhearsay under La. C.E. art. 801(D)(1)(a), but that it did not lay the proper foundation by first directing Officer Mitchell’s attention to the prior statement and giving him a chance to admit it.
The State correctly contends that Lieutenant Italiano’s testimony was independently admissible as nonhearsay pursuant to La. C.E. art. 801(D)(1)(c) as it was a statement of identification of a witness. Lieutenant Italiano’s testimony at | tissue related to Officer Mitchell’s statement identifying Mr. Joyner as the person who shot at him.
*691 This court recently reviewed the jurisprudence on La. C.E. art. 801(D)(1)(c) in State v. Duncan, 11-0563, p. 18 (La.App. 4 Cir. 5/2/12), 91 So.3d 504, 516, stating:
A statement of identification by a witness of a person after perceiving him— as contemplated by La. C.E. art. 801(D)(1)(c) — may be used assertively, as substantive evidence of guilt, and may be established through the testimony of the person to whom the statement was made, even if the witness denies making an identification or fails to make an in-court identification. State v. Stokes, 2001-2564, p. 1 (La.9/20/02), 829 So.2d 1009, 1010, citing State v. Johnson, 99-3462, pp. 2-3 (La.11/3/00), 774 So.2d 79, 80-81. See also State v. Collins, 2001-1459 (La.App. 4 Cir. 8/21/02), 826 So.2d 598, citing and following Johnson on the issue of the admissibility of a prior inconsistent statement by a witness that was one of the identification of a person made after perceiving him, pursuant to La. C.E. art. 801(D)(1)(c).
In Johnson, the Louisiana Supreme Court directly addressed the impact of La. C.E. art. 801(D)(1)(c) on the general rule that a witness’s prior inconsistent statement is not admissible as substantive evidence, stating that “[a]n exception to this general rule exists for cases in which the witness’s prior inconsistent statement also constitutes a prior statement of identification for purposes of La. C.E. art. 801(D)(1)(c), Louisiana’s counterpart of Fed. R.Evid. 801(d)(1)(c).” (Emphasis added). Johnson, 99-3462, p. 2, 774 So.2d at 80.
Id. Article 801(D)(1)(c) contains no requirement that the testifying witness’s attention be directed to the prior statement or that he be given a chance to admit the disputed fact.
Given that Lieutenant Italiano’s testimony was independently admissible as non-hearsay, for the truth of the matter of asserted, under La. C.E. art. 801(D)(1)(c), without any foundation being laid as required by La. C.E. art. 801(D)(1)(a), Mr. Joyner’s argument that the trial court erred in admitting the evidence for lack of the |2Sproper foundation required by La. C.E. art. 801(D)(1)(a) is without merit. This assignment of error lacks merit.
ASSIGNMENT OF ERROR NO. 2
Mr. Joyner’s second assignment of error is that the trial court erred in denying his motion for a new trial. Mr. Joyner neither briefed this assignment of error nor presented an argument elsewhere in his appellate brief directly addressing it. Because Mr. Joyner failed to brief this assignment of error, it is deemed to have been abandoned. State v. Alexander, 03-2072, p. 17 (La.App. 4 Cir. 5/19/04), 875 So.2d 853, 862 (“This assignment of error was not briefed and is deemed to have been abandoned,” citing Rule 2-12.4, Uniform Rules of Louisiana Courts of Appeal). Regardless, this assignment of error, even if it had been briefed, lacks merit. For the reasons discussed elsewhere in this opinion, we find no merit to any of Mr. Joyner’s other assignments of error, including Assignments of Error Nos., 1, 3, 4 and 6.[11]
*692 ASSIGNMENT OF ERROR NO. 4
Mr. Joyner’s fourth assignment of error is that the trial court erred in barring the defense from introducing Officer Thomas’ personnel file to attack the officer’s credibility or to impeach him. Mr. Joyner submits that the personnel file included the following: an unprovoked attack on a fellow officer, a neglect of duty charge, |29an insubordination violation of departmental rules, a lack of truthfulness charge, and a mishandling evidence and mishandling an injured subject charge.
Mr. Joyner cites no statutory authority (such as a Louisiana Code of Evidence article) in support of his argument that the personnel file was admissible to attack Officer Thomas’s credibility or to impeach him. Instead, he cites State v. Cureaux, 93-0838 (La.App. 4 Cir. 10/27/94), 645 So.2d 1215, for the proposition that a defendant can impeach an officer’s testimony that he had been a police officer for four years with extrinsic evidence that the officer had been suspended for sixteen months. Mr. Joyne’s characterization of this court’s holding in Cureaux is not entirely correct.
In Cureaux, the issue was whether the trial court erred in denying the defendant’s motion for a new trial based on the discovery of new evidence — a newspaper article published after the defendant’s August/September 1992 trial. The newly discovered evidence was that one of the arresting police officers testified at the trial that he had been a NOPD officer for four years; however, the officer was suspended from the department from September 1988 to January 1990 for cheating on an examination. In addressing this issue, this court stated:
Although the defendant could impeach Officer Taylor’s testimony that he had been a police officer for four years with extrinsic evidence that Officer Taylor had been suspended from the police force for some sixteen months, the defendant could not have gone into the basis for the suspension under LSA-C.E. art. 608 B.[12] ... There is a real risk that once the fact of Officer Taylor’s suspension is raised, the reason for the suspension (Officer Taylor’s alleged cheating on an examination) would be explored. In turn, the reasons for Officer IsnTaylor’s reinstatement would be delved into. As a result, evidence of these collateral issues related to Officer Taylor’s credibility is substantially outweighed by the risks of undue consumption of time, confusion of the issues, or unfair prejudice. We find no abuse in the trial court’s discretion in denying the motion for new trial.
Cureaux, 93-0838, p. 5, 645 So.2d at 1218. What this court classified as permissible impeachment evidence in Cureaux was the fact the officer was suspended for sixteen months, not the basis for the officer’s suspension. In so finding, this court, citing La. C.E. art. 608(B), stated that evidence as to the basis for the officer’s suspension w;as inadmissible.
In his assignment of error, Mr. Joyner does not address La. C.E. art. 608(B). Nor does Mr. Joyner contend that he sought to admit only the fact that Officer Thomas had been suspended. Instead of citing any specific discipline imposed on *693 Officer Thomas, Mr. Joyner cites “particular acts” by Officer Thomas — his striking another officer, being insubordinate, being untruthful, and mishandling evidence. Mr. Joyner does not suggest that Officer Thomas was convicted of any criminal offense in connection with these cited particular acts. Nor does he suggest that he had a constitutional right to present evidence of these cited particular acts. Under these circumstances, evidence of these cited particular acts was inadmissible to attack the credibility of Officer Thomas or to impeach him. The trial court thus properly denied Mr. Joyner the right to present such evidence. There is no merit to this assignment of error.
ASSIGNMENT OF ERROR NO. 5
Mr. Joyner’s fifth assignment of error is that the trial court erred in prohibiting his defense counsel from referring to the multiple prior instances that | S1 Officer Mitchell, under oath, denied that Mr. Joyner shot Officer Thomas. In support of this contention, Mr. Joyner cites to the following colloquy that occurred during trial:
BY MR. BURG:
Q. Officer Mitchell, the previous statements that you made to this jury and four other times so far—
MR. RANIER:
Objection, Judge. About the other hearings.
THE COURT:
Yes. Sustained.
BY MR. BURG:
Q. Yesterday you testified that the only person you saw was Mr. Carter with a gun, correct?
A. Yes.
Q. And today you’re stating the same thing, correct?
A. Yes.
The question to Officer Mitchell concerned statements he made “four other times,” and the State’s objection implicitly recognized that defense counsel (Mr. Burg) was referring by his question to prior hearings at which Officer Mitchell testified.[13]
Mr. Joyner contends that the trial court erred in barring his trial counsel from questioning Officer Mitchell about his testimony at pre-trial motions and his testimony at Mr. Carter’s bench trial. However, Officer Mitchell never denied that Mr. Joyner shot Officer Thomas. Officer Mitchell previously testified, as he did at | S2the trial in this case, that the only person he saw with a gun that day was Mr. Carter and that Mr. Carter was the person who shot at him. Officer Mitchell steadfastly testified in all the proceedings that he did not see Officer Thomas get shot and that he could not say who shot Officer Thomas. Officer Mitchell’s prior testimony was to the effect that he did not see Mr. Joyner with a gun at the Chevron Store.
Mr. Joyner argues on appeal that because the State presented the testimony of Lieutenant Italiano — who testified that Officer Mitchell told him that Mr. Joyner fired a gun at him and that he thought Mr. Joyner also had shot Officer Thomas— Officer Mitchell’s prior testimony was non-hearsay under La. C.E. art. 801(D)(1)(b).[14] *694 For a statement to qualify as an exemption from the hearsay rule under La. C.E. art. 801(D)(1)(b), it is necessary for the witness’ statement to have been “attacked as a recent fabrication or claimed to have been prompted by an improper influence or motive.” George Pugh, Robert Force, Gerard Rault & Kerry Triche, HANDBOOK ON LOUISIANA EVIDENCE LAW, Authors’ Note (3), La. C.E. art. 801, p. 632 (2011). “[Tjhere must have been an express or implied charge that the witness is now lying (‘fabrication’) and not just in error.” Id. at p. 633 (citing Weinstein & Berger, WEINSTEIN’S EVIDENCE, ¶ 801-185 et seq.) Such is the case here.
lüjjThe State introduced the testimony of Lieutenant Italiano and Lieutenant Austin regarding what Officer Mitchell told them about Mr. Joyner having a gun and shooting at Officer Mitchell. Those prior statements by Officer Mitchell were inconsistent with his trial testimony. Mr. Joyner, however, fails to cite any express or implied charge by the State that Officer Mitchell fabricated his trial testimony. It is equally plausible that Officer Mitchell was simply mistaken in his recollection, ie., he was in error. The improper influence or motive element required by La. C.E. art. 801(D)(1)(b) is not present here. Accordingly, Mr. Joyner has failed to establish that the former testimony of Officer Mitchell was nonhearsay under La. C.E. art. 801(D)(1)(b), or that the trial court erred in sustaining the State’s objection to the introduction of that evidence. There is no merit to this assignment of error.
ASSIGNMENT OF ERROR NO. 6
Mr. Joyner’s sixth assignment of error is that the he was denied a fair trial by the exclusion of evidence of Lieutenant Itali-ano’s pending federal investigation. The pending federal investigation was for falsifying records and lying to the F.B.I. concerning the unlawful killing of a civilian (Henry Glover) by NOPD officers in the aftermath of Hurricane Katrina. Mr. Joyner acknowledges that Lieutenant Itali-ano’s indictment for these two charges did not occur not until six months after his trial and conviction, which was in January 2010.[15] According to Mr. Joyner, |S4after the investigation of Lieutenant Italiano was discovered, the State informed Mr. Joyner’s trial counsel “that it knew that Lieutenant Italiano was under investigation.” Even assuming, arguendo, that the federal investigation of Lieutenant Itali-ano’s was ongoing before and during Mr. Joyner’s trial, the evidence of that federal investigation, for the reasons discussed below, was not admissible under the rules of evidence.
Mr. Joyner contends that the evidence of the federal investigation was admissible because it was within the exception to the general rule of La. C.E. art. 609.1 that impeachment of a witness in a criminal case can be made by evidence of convictions only. Article 609.1(B) provides that “[p ]enerally, only offenses for which the witness has been convicted are admissible upon the issue of his credibility....” La. C.E. art. 609.1(B)(emphasis supplied.) The use of the word “generally” in this article “presumably acknowledges the possible use of arrests, indictments and the *695 like where independently relevant, for example, to show bias.” George Pugh, Robert Force, Gerard Rault & Kerry Triche, HANDBOOK ON LOUISIANA EVIDENCE LAW, Authors’ Note (2), La. C.E. art. 609.1, pp. 553-554 (2011). “Apart from independent relevancy, such as the possibility of bias, evidence of an arrest, indictment or the like, short of a conviction is inadmissible to impeach a witness.” Id.; see also La. C.E. art. 607(D)(l)(permitting the introduction of extrinsic evidence to attack the credibility of a witness by showing the witness’s bias, interest, corruption, or defect of capacity). A witness’s bias or interest may arise from arrests or pending criminal [ .^charges, or the prospect of prosecution, even when he has made no agreements with the state regarding his conduct. State v. Vale, 95-1230, p. 4 (La.1/26/96), 666 So.2d 1070, 1072.
Lieutenant Italiano was being investigated by federal authorities for possible violations of federal laws involving falsifying records and lying to the F.B.I. Mr. Joyner suggests that because of his problems with federal authorities, Lieutenant Italiano had an interest in testifying falsely in Mr. Joyner’s state court prosecution for the attempted murders of two NOPD officers in the aftermath of Hurricane Katrina. The false testimony, according to Mr. Joyner, was that it was Mr. Joyner, not Mr. Carter, who shot at Officer Mitchell and thus that it was Mr. Joyner who probably shot Officer Thomas. However, Mr. Carter was never charged for these crimes.[16] Nor does Mr. Joyner articulate any argument suggesting why Lieutenant Italiano might have believed that he could obtain favor with the federal authorities by falsely testifying in this state court prosecution.
Evidence that before and during Mr. Joyner’s trial Lieutenant Italiano was being investigated by federal authorities was not independently relevant to the issue of Lieutenant Italiano’s bias or interest in testifying as to what Officer Mitchell told him occurred on the day of the shooting. Accordingly, the evidence was not admissible under the exceptions to La. C.E. art. 609.1’s general rule that only evidence of convictions is admissible to impeach the credibility of a witness in a criminal case.
UfiMr. Joyner asserts that his inability to introduce evidence of the federal investigation deprived him of his right to present a defense. In support, he cites Washington v. Texas, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967).[17] He raises the issue of his Sixth Amendment rights to fully cross examine witnesses against him and to present a meaningful defense. In State v. Sartain, 08-0266, p. 16 (La.App. 4 Cir. 12/30/08), 2 So.3d 1132, 1141, this court stated:
A criminal defendant has the constitutional right to present a defense. U.S. Const. amend. 6; La. Const. Art. 1 § 16; Washington v. Texas, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967); State v. Gremillion, 542 So.2d 1074 (La.1989); State v. Vigee, 518 So.2d 501 (La.1988). Due process affords the de *696 fendant the right of full confrontation and cross examination of the State’s witnesses. Chambers v. Mississippi 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973); State v. Mosby, 595 So.2d 1135 (La.1992). It is difficult to imagine rights more inextricably linked to our concept of a fair trial.
Evidentiary rules may not supersede the fundamental right to present a defense.
Encompassed in the right of confrontation is the right of the accused to impeach a witness for bias or interest; the right to expose a witness’s motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination. State v. Lawrence, 08-0397, p. 9 (La.App. 4 Cir. 2/4/09), 5 So.3d 896, 902. However, evidence may be excluded if it is irrelevant. State v. Huckabay, 00-1082, p. 26 (La.App. 4 Cir. 2/6/02), 809 So.2d 1093, 1108 (citing State v. Casey, 99-0023, pp. 18-19 (La.1/26/00), 775 So.2d 1022, 1037).
|37As discussed earlier, evidence of the federal investigation of Lieutenant Ita-liano was irrelevant and thus inadmissible at trial. Regardless, confrontation errors are subject to harmless error analysis. Under this analysis, the verdict may stand if the reviewing court determines that the guilty verdict rendered in the particular trial was surely unattributable to the error. State v. Broadway, 96-2659, p. 24 (La.10/19/99), 753 So.2d 801, 817; Lawrence, supra; Huckabay, supra. In this case, Lieutenant Italiano’s testimony that Officer Mitchell told him on the day of the incident that Mr. Joyner shot at him and had probably shot Officer Thomas was cumulative to the testimony by Lieutenant Austin, the lead investigator in the case. Lieutenant Austin testified at trial that on the day of the shooting Officer Mitchell informed him that as he came out of the door of the Chevron Store, after having heard a shot, he received gunfire from Mr. Joyner, at which time he returned fire at Mr. Joyner. Lieutenant Austin replied in the negative when asked whether Officer Mitchell hesitated in identifying Mr. Joyner as the shooter.
In sum, even assuming the evidence concerning the federal investigation into Lieutenant Italiano’s unrelated actions was relevant and admissible, the guilty verdict rendered against Mr. Joyner was surely unattributable to the jury not hearing that Lieutenant Italiano was under federal investigation for such unrelated acts. This assignment of error thus lacks merit.
ASSIGNMENT OF ERROR NO. 7
Mr. Joyner’s seventh assignment of error is that the trial court erred in admitting, over his objection, three firearms that were not connected to the Isashooting. As noted, the State introduced at trial four firearms that were recovered.[18] At trial, there was testimony that all four men — Mr. Joyner, Mr. Thomas, Mr. Carter, and Mr. Walker — were armed. Prom the testimony that there were four armed suspects, it can be inferred that at least four firearms were on the scene in addition to the officers’ firearms. Lieutenant Austin, the lead investigator, testified that Officer Mitchell informed him on the day of the shooting that Mr. Joyner shot at him; that Mr. Joyner then fled with two other suspects who were also armed; and that Mr. Walker, *697 then on top of Officer Thomas, raised a gun towards him, whereupon Officer Mitchell fired one shot at Mr. Walker, striking him in the shoulder. In addition, Officer Thomas had been told that the four men had been robbing people all morning with guns.
Although no evidence was presented at trial that any of the firearms other than the Glock were connected with the shooting,[19] Mr. Joyner fails to point to any exploitation of the admission of the other three firearms by the State. Crediting the good sense and fair mindedness of the jury (which returned not guilty verdicts in Mr. Walker’s favor as to both charges against him and a not guilty verdict in Mr. Joyner’s favor as to one of the charges against him), the guilty verdict rendered in Rathe instant case against Mr. Joyner was surely unattributable to the admission of the three firearms. Thus, even assuming, ar-guendo, that evidence as to the three other weapons was irrelevant and should have been excluded, any such error was harmless.[20] There is no merit to this assignment of error.
ASSIGNMENTS OF ERROR NOS. 8 AND 9
Mr. Joyner’s last two assignments of error are that his thirty-five year sentence is unconstitutionally excessive and that the trial court erred in denying his motion to reconsider the sentence. The Louisiana Constitution prohibits excessive sentences. La. Const, art. I, § 20. A sentence is unconstitutionally excessive if it makes no measurable contribution to acceptable goals of punishment, is nothing more than the purposeless imposition of pain and suffering, and is grossly out of proportion to the severity of the crime. State v. Ambeau, 08-1191, p. 9 (La.App. 4 Cir. 2/11/09), 6 So.3d 215, 221. A sentence is grossly disproportionate if, when the crime and punishment are considered in light of the harm done to society, it shocks the sense of justice. State v. Galindo, 06-1090, pp. 15-16 (La.App. 4 Cir. 10/3/07), 968 So.2d 1102, 1113. Although a sentence is within the statutory limits, the sentence may still violate a defendant’s constitutional right against excessive 14npunishment. *698 State v. Every, 09-0721, p. 7 (La.App. 4 Cir. 3/24/10), 35 So.3d 410, 417. However, the penalties provided by the legislature reflect the degree to which the criminal conduct is an affront to society. State v. Cassimere, 09-1075, p. 5 (La.App. 4 Cir. 3/17/10), 34 So.3d 954, 958.
The statutory sentencing range for attempted first degree murder is imprisonment at hard labor for not less than ten years and not more than fifty years, without the benefit of parole, probation, or suspension of sentence. La. R.S. 14:30; 14:27. Mr. Joyner’s sentence of thirty-five years is roughly midrange — twenty-five years more than the statutory minimum sentence and fifteen years less than the maximum sentence.
The trial court obtained a presentence investigation (“PSI”) report. It reflected that Mr. Joyner was twenty-two years old at the time of the instant offense, and this was his first offense and first conviction. Mr. Joyner moved to New Orleans when he was fourteen to live with his father. His parents were divorced. He started using marijuana at age fifteen. Also at age fifteen, he started working in his father’s clothing store. His father died when he was age eighteen, and he became the owner of the clothing store. Mr. Joyner maintained his innocence. Nonetheless, he stated that he was sorry for what happened to the officer and that he wanted the officer to know he was sorry.
The PSI also reflected that Officer Thomas was forced to retire after twenty years on the police force due to medical reasons. He was disfigured as a result of the shooting and suffered from depression and seizures. The PSI states that Officer |41Thomas admitted to being bitter because he was forced to retire. He cannot drive because of the seizures, and he said this had robbed him of his freedom of movement. At trial, Officer Thomas testified that he had four plates and sixteen screws in his head and that as a result of the injuries from the shooting he takes five different medications, including one for seizures. Officer Thomas stated that he was in favor of the maximum sentence for Mr. Joyner.
The circumstances of the instant case were particularly egregious. Officers Thomas and Mitchell were on patrol on the Westbank of New Orleans in the aftermath of Hurricane Katrina, essentially stranded from other officers on the Eastbank by the unprecedented hurricane-induced flooding on that side of the Mississippi River. The regular police radio channels were down, NOPD’s headquarters was flooded, and they were communicating on a single channel shared by the JPSO. Unlike a regular day on patrol, the two officers were armed not only with their police issued handguns, but also with their personally-owned firearms, girded for the dangers they might face in aftermath of Hurricane Katrina.
Officer Thomas was in the process of patting down four men who, a female bystander had told him, had been robbing people all morning with guns. Mr. Joyner continually harangued Officer Thomas as the officer was patting down the four men, until he shot the officer in the head as he was patting down the person standing next to him. Mr. Joyner was next in line to be frisked for weapons when he shot Officer Thomas in the head from a foot or two away. At the time of his apprehension, Mr. Joyner reached for the firearm (the Glock) that had been fired hueven times at the Chevron Store in connection with Officer Thomas’ shooting. As he reached for the firearm, he proclaimed to the arresting officers that he had killed one police officer and that he was going to kill another, because he was a “soldier.”
On appeal, Mr. Joyner argues that he was a successful businessman; a family man (father of two children); a tax-paying citizen; and, given his lack of a prior rec *699 ord, a law-abiding man. He submits that these factors should be considered in light of the nature of the trial testimony — essentially arguing his innocence of the offense for which he convicted. Despite Mr. Joyner’s youth, his lack of any prior criminal record, and his apparent work ethic, the record supports the sentence the trial court imposed.
Considering the totality of the facts and circumstances, it cannot be said that the sentence makes no measurable contribution to acceptable goals of punishment, is nothing more than the purposeless imposition of pain and suffering, is grossly out of proportion to the severity of the crime, or shocks the sense of justice. Neither Mr. Joyner’s contention that his sentence is unconstitutionally excessive,[21] nor his contention that the trial court erred in denying his motion to reconsider sentence has merit. Thus, the final two assignments of error lack merit.
| ^DECREE
For the foregoing reasons, the defendant’s conviction and sentence are affirmed.
AFFIRMED

. Sye Carter was also indicted for possession of a weapon by a convicted fellow. Following an October 2007 bench trial, Mr. Carter was acquitted of the charge.

. Officer Mitchell acknowledged that he probably inflicted Mr. Walker's gunshot wound with his personal gun.

. Officer Mitchell identified Mr. Joyner in court.

. The BMW belonged to Mr. Joyner's grandmother, Irene Harris. At that time, Mr. Joyner was living with his grandmother on Wabash Street.

. Detective Gros identified Mr. Joyner in court.

. Lieutenant Italiano identified Mr. Joyner in court.

. Detective Barnes identified Mr. Joyner in court.

. Officer Jackson stated that his first report, reflecting his comparison of the single latent fingerprint to fingerprints of Mr. Walker and Mr. Carter, was dated October 17, 2006. His second report, reflecting his comparison of that same single latent fingerprint to fingerprints of Mr. Joyner, was dated January 8, 2010, which he confirmed was shortly before trial. He confirmed that the latent fingerprint he compared to Mr. Joyner was one of those recovered in December 2005. He said he also was requested to compare the latent fingerprint to a "Thomas Montanez” (apparently "Mr. Thomas”); however, he was unable to obtain a set of his fingerprints that were suitable for comparison.

. When issues are raised on appeal as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. State v. Hearold, 603 So.2d 731, 734 (La.1992); State v. Marcantel, 00-1629, p. 8 (La.4/3/02), 815 So.2d 50, 55.

. Officer Thomas patted down Mr. Thomas first, then Mr. Walker. As he approached Mr. Walker, Mr. Joyner started giving him static, talking steadily and complaining that he was being harassed. Officer Thomas testified that Mr. Walker tried to calm Mr. Joyner down. Officer Thomas completed the pat-down of Mr. Walker and started on Mr. Carter, the next of the four men in line. Officer Thomas testified that as he was patting down Mr. Carter, Mr. Joyner shot him in the head from a foot or two away.

. Mr. Joyner placed "Assignment of Two-The District Court Respectfully Erred in the Denial of the Motion for New Trial" underneath the titles of his Assignments of Error Nos. 1, 3, 4 and 6 — covering claims he based his motion for new trial upon. However, not only did Mr. Joyner fail to brief his Assignment of Error No. 2 in a separate assignment of error discussion, he also failed to address in either Assignments of Error Nos. 1, 3, 4 or 6 how the trial court erred in denying his motion for new trial as to those respective claims of error. Nor did Mr. Joyner, either in addressing those four assignments of error, or *692 at the conclusion of his appellate argument, mention the denial of his motion for new trial.

. Article 608(B) provides that: "Particular acts, vices, or courses of conduct by a witness may not be inquired into or proved by extrinsic evidence for the purpose of attacking his character for truthfulness, other than conviction of crime as provided in Articles 609 and 609.1 or as constitutionally required.” La. C.E. art. 608(B).

. Officer Mitchell also testified at Mr. Carter’s October 30, 2007 bench trial.

. La. C.E. art. 801(D)(1)(b) provides:
D. Statements which are not hearsay. A statement is not hearsay if:
(1) Prior statement by witness. The declar-ant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is:
[[Image here]]
(b) Consistent with his testimony and is offered to rebut an express or implied charge *694 against him of recent fabrication or improper influence or motive.

. On June 11, 2010, Lieutenant Italiano was indicted for one count of obstructing a federal civil rights investigation by knowingly falsifying and making false entries in documents with the intent to obstruct the federal investigation, in December 2005, and one count of making false statements to the F.B.I., in 2009. Lieutenant Italiano was tried for these two offenses and found not guilty by a federal jury.

. Although Mr. Carter was arrested along with Mr. Walker and Mr. Joyner in connection with the attempted murders of Officer Thomas and Officer Mitchell, he was only charged with possession of a firearm by a convicted felon.

. Mr. Joyner does not argue that the failure of the State to divulge the federal investigation of Lieutenant Italiano before or during trial was a violation of the State’s obligation under Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) to turn over exculpatory information — although he posits that had the State disclosed its knowledge of the federal investigation of Lieutenant Italiano, the trial court would have had to decide the issue of admissibility.

. The four firearms were as follows: (1) a .45 auto caliber Glock Model 36 semiautomatic pistol (the ''Glock”); (2) a .38 caliber Rossi revolver; (3) a 9mm caliber Bryco Arms Jennings semiautomatic pistol; and (4) a 12 gauge Mossberg shotgun, which Mr. Joyner had purchased earlier that year ("Mr. Joyner's Gun”). The Glock was found on Mr. Joyner. Mr. Joyner's Gun apparently was recovered in the BMW. The remaining two firearms were recovered from a backyard shed by Officer Thomassie, who participated in the search for the suspects on foot.

. Seven spent .45 auto caliber cartridge casings found at the scene of the shooting were determined to have been ejected from the Glock. The 9mm caliber Biyco Arms Jennings pistol found in the backyard shed was excluded by Jefferson Parish Crime Lab testing as the 9mm firearm that had ejected the 9mm spent cartridge casings found at the scene of the shooting. There was no evidence that the .38 caliber revolver recovered in the backyard shed, or the 12 gauge Mossberg shotgun, had been fired at the crime scene or had been fired at a point in time close to the time of the shooting, or were otherwise connected with the shooting incident.

. See State v. Landry, 388 So.2d 699, 704 (La.1980)(not reversible error to admit defendant’s pocket knife, where testimony was that murder weapon was a large "Buck” knife; coroner testified that victim died from a wound inflicted by a knife with a blade at least five to six inches long; no attempt was made to connect the pocket knife with the murder; and prosecutor made no attempt to exploit the introduction of the pocket knife.); State v. Manieri, 378 So.2d 931, 933 (La.1979)(harmless error to admit three knives unconnected with case, where State witness testified that none was the murder weapon, and no effort was made to connect the knives with the crime or the accused); State v. Richardson, 96-2598, pp. 4-6 (La.App. 4 Cir. 12/17/97), 703 So.2d 1371, 1373-74 (harmless error to admit shotgun defendant dropped in an unrelated incident the same day as armed robbery/carjacking in which handgun was used by one of defendant's co-perpetrators, and where the testimony made it clear that the shotgun was not involved in armed robbery for which defendant was being tried — "Moreover, given counsel’s failure to object to any of the preceding references to the shotgun, it does not appear that the formal introduction of this exhibit would constitute reversible error.”).

. This court affirmed a forty-year sentence imposed on a first offender for the attempted murder of a NOPD officer as not unconstitutionally excessive in State v. Laird, 572 So.2d 793 (La.App. 4th Cir.1990). In that case, the officer had stopped the defendant, who had been smoking marijuana and drinking in the French Quarter, for making an illegal left in a car that turned out to be stolen. The officer gave the defendant a field sobriety test, which he failed. The officer advised the defendant that he was under arrest and was attempting to place him in the patrol car when the defendant swung at the officer, grabbed his gun, pointed it at the officer, and ordered the officer to lie on the ground. When the officer did not move, the defendant struck him in the head with the gun, causing the officer to fall to the ground. The defendant then shot the officer in the back as he lay on the ground and afterwards kicked him. The bullet left the officer permanently paralyzed from the waist down. The defendant fled to the river, where he discarded the gun, and he was apprehended minutes later. See also State v. Ellis, 572 So.2d 748 (La.App. 4th Cir.1990)(affirming as not constitutionally excessive a fifty-year sentence imposed on an eighteen-year-old defendant for shooting a NOPD officer, where the defendant had an extensive juvenile record).