MADELEINE M. LANDRIEU, Judge.
|TDefendant Christopher Weathersby appeals his convictions of one count of manslaughter and three counts of aggravated battery, and the sentences imposed. For the reasons that follow, we affirm Mr. Weathersby’s convictions. We also affirm the sentences he received for the three aggravated battery offenses. However, because the trial court failed to rule on Mr. Weathersby’s motion to reconsider the manslaughter sentence, we remand for a ruling on that motion, preserving to Mr. Weathersby his right to appeal the manslaughter sentence in the event the trial court denies his motion.

STATEMENT OF THE CASE

Mr. Weathersby was charged by grand jury indictment on May 14, 2009 with one count of second degree murder, a violation of La. R.S. 14:30.1, and three counts of attempted second degree murder, violations of La. R.S. 14:(27)30.1. The defendant pled not guilty at his arraignment, and the trial court subsequently denied his motions to suppress the identification and evidence. Mr. Weathersby was tried by a twelve-person jury on May 10-18, 2011, and found guilty of the 12responsive verdicts of manslaughter on the first count and aggravated battery on the remaining three counts. Following a hearing, the trial court denied Mr. Weathersby’s motion for new trial. On October 21, 2011, Mr. Weathersby was sentenced to thirty years at hard labor on the manslaughter conviction and eight years at hard labor on each of the three aggravated battery convictions, with all sentences to run concurrently. Mr. Weathersby filed a written motion to reconsider his manslaughter sentence on November 2, 2011. On September 25, 2012, the trial court granted Mr. Weathersby an out-of-time appeal.

FACTS

Mr. Weathersby was convicted of manslaughter for the March 1, 2009 killing of Jamal Dorsey and of three counts of aggravated battery for the shootings of Ash-ten Dorsey, Jamaal Jones, and Angelo Jackson in the same incident.
The facts adduced at trial established that on the night of the incident, Mr. Weathersby drove a black Dodge Durango to a bowling alley in Kenner accompanied by four friends: Corey Willis, Dominique Smith, Kristy Gatlin and Sheena Carruth. That same night, Jamal Dorsey drove his white Dodge Durango to the same bowling alley accompanied by his wife, Ashten, and two friends: Jamaal Jones and his girlfriend, Jahlissa Wallace. Mr. Dorsey’s group was joined at the bowling alley by Angelo Jackson and his wife, Troylynn.[1] The two groups were bowling next to each other. At a certain point the lights went out in the bowling alley, and there was a verbal altercation between Jamal Dorsey and Corey pWillis after Mr. Willis took a bowling ball from the other group’s lane. The altercation was broken up by the bowling alley’s security personnel. Members of both groups testified that about ten minutes later, Mr. Willis and Mr. Dorsey *264 appeared to “make peace” with each other by shaking hands, and they all continued bowling.
Mr. Weathersby’s group left the bowling alley first, about fifteen minutes before closing time. Mr. Weathersby’s group sat in the Black Durango in the parking lot until Mr. Dorsey’s group came out, at which point Mr. Weathersby pulled his vehicle alongside Mr. Dorsey and exchanged words with him. There was conflicting testimony as to what was said. All the members of Mr. Dorsey’s group got into the white Durango except Angelo Jackson and his wife, who got into their red Monte Carlo. All three vehicles left the parking lot of the bowling alley at the same time and got on the interstate heading toward the New Orleans Westbank. There was conflicting testimony as to whether the black Durango was following the white Durango or vice versa, and as to whether one vehicle pulled alongside the other on the interstate and/or whether the driver of one vehicle gestured to those in the other vehicle. At some point, the red Monte Carlo broke down, and Mr. Dorsey stopped and picked up the Jacksons.
Mr. Weathersby’s group in the black Durango exited the interstate on the West-bank, dropped Sheena Carruth off at her house and stayed ten to fifteen minutes, then headed to the residence of Corey Willis’ girlfriend on Americus Street, intending to drop Mr. Willis off there. Testimony from those in Mr. |4Dorsey’s group indicated that they were on their way to drop off the Jacksons at the home of Ms. Jackson’s aunt on JoAnn Place when they spotted Mr. Weathersby’s black Durango parked on Americus Street. Mr. Dorsey then stopped his white Durango facing the black Durango. After some of the passengers exited both vehicles, Corey Willis got into a fist fight with Jamal Dorsey in a grassy area, with the others looking on and/or trying to stop the fight.[2] Mr. Weathersby got out of his vehicle with a gun and stood between Jamaal Jones and Jahlissa Wallace in front of the black Du-rango. Mr. Weathersby fired at Jamaal Jones, grazing him, and then fired several shots into the group surrounding the altercation. Mr. Dorsey was killed and three others were wounded. Upon being shot, Mr. Jones, who had a handgun in his waistband, ran to an alley between two houses and fired seven to eight shots back toward Mr. Weathersby.
When the shooting began, Angelo Jackson, his wife Troylynn, Ashten Dorsey and Jahlissa Jackson ran to the nearby home of Troylynn Jackson’s aunt. Angelo and Ashten were wounded. Jamaal Jones, who was also wounded, jumped a fence behind the alley and ran first to his mother’s home and then to his girlfriend Jahlissa Wallace’s house. Everyone who had been in the black Durango got back into that vehicle and fled the scene with Mr. Weath-ersby. Mr. Weathersby dropped off Kristy Gatlin and then drove to the residence of Dominique Smith in Baton Rouge, where he spent the night with her.
IsNOPD Homicide Detective Richard Chambers arrived on the scene to observe a white Dodge Durango and the victim, Jamal Dorsey, who had already been pronounced dead. Two other victims had been transported to University Hospital for medical treatment. Det. Chambers observed approximately six spent 9mm cartridge casings spread from the driveway between 3002 and 8010 Americus Street toward the victim’s body. He also ob *265 served that the doors of the white Duran-go were open, and that there was a bullet hole or bullet strike mark in the front door. Det. Chambers attended the autopsy of the victim and collected his clothes.
At the scene of the shooting, an uninjured victim gave Det. Chambers the license plate number of the suspect’s vehicle, which was registered to Mr. Weathersby. In his investigation, Det. Chambers learned of the prior verbal altercation that had occurred at the bowling alley. Video footage from the bowling alley did not show the altercation, but showed those in Mr. Weathersby’s vehicle, a black Dodge Durango, exiting the bowling alley prior to Mr. Dorsey’s group leaving. The video footage also showed that the black Durango sat in place until Mr. Dorsey’s group came out of the bowling alley, and then the driver of the black Durango pulled up to the Dorsey group.
Later on the day of the shooting, Jamaal Jones came to the homicide office to speak with Det. Chambers. He told the detective that he was one of the victims who had been inside of Jamal Dorsey’s vehicle, and that he had fired his weapon at the perpetrator, who had first fired at him and the others. Mr. Jones related that the | (¿first shot fired at him had grazed him in the neck, whereupon he had run to a driveway at 3002 Americus Street. Jamaal Jones told the detective that he had taken cover behind the side of the residence and had fired back at the perpetrator.
Det. Chambers was not aware that two firearms had been discharged in the incident until Mr. Jones showed up at the police station. Mr. Jones was still wearing the clothing he had been wearing at the time he had been shot. There was a through-and-through hole in hood of his sweatshirt, and a graze wound was visible on the rear of his neck. Mr. Jones turned over to Det. Chambers the .40 caliber semiautomatic pistol he had used in the incident. Det. Chambers then returned to the scene and found .40 caliber spent cartridge casings near where Mr. Jones said he had fired his gun.
The defense stipulated that Det. Chambers conducted five separate photo identification lineups using the defendant’s driver’s license photo; that four individuals identified Mr. Weathersby from the photo — Jahlissa Wallace, Jamaal Jones,- Troy-lynn Jackson, and Angelo Jackson; and that a fifth person, Ashten Dorsey, was unable to make an identification.
After interviewing these five witnesses, Det. Chambers obtained an arrest warrant for Mr. Weathersby. Det. Chambers learned that Mr. Weathersby had returned to the bowling alley the following day. Det. Chambers then obtained additional video footage from the bowling alley from that following day, which showed defendant looking up at the video -surveillance camera.
|7Pet. Chambers learned the name of a female, Kristy Gatlin,[3] who had been in the black Durango with Mr. Weathersby. Ms. Gatlin was identified in photo lineups by Jahlissa Wallace, Jamaal Jones and Troy-lynn Jackson, and . was tentatively identified by Angelo Jackson. After Det. Chambers secured a warrant, Ms. Gatlin was arrested at her home for being an accessory after the fact, was advised of her rights, and gave a statement. Two other individuals were also arrested for being accessories after the fact: Dominique Smith and Corey Willis. Ms. Smith, Mr. Weathers- *266 by’s girlfriend at the time, was arrested with the defendant in Baton Rouge. She was advised of her rights and gave a statement to Det. Chambers. Corey Willis was subsequently arrested and had an attorney present when he was advised of his rights and gave a statement. Det. Chambers identified rights-of-arrestee forms for all three individuals. The detective testified that all three individuals gave their statements freely and voluntarily, without any promises being made by him in exchange for them.
The gun Mr. Weathersby used in the shooting was never recovered. The black Dodge Durango Mr. Weathersby was driving on the day of the shooting was recovered at an apartment complex in Baton Rouge.
The State presented testimony from three NOPD Crime Lab technicians/ specialists, who identified photographs and physical evidence taken at the scene, Land a Senior Police Dispatcher, who identified the incident recall and a recording of the corresponding 911 call.
Samantha Huber, M.D., employed by the Orleans Parish Coroner’s Office, was qualified by stipulation as an expert in the field of forensic pathology. She performed an autopsy on Mr. Dorsey and determined that he had sustained one gunshot that had entered at the left front of his chest and exited the right rear of his back, penetrating both his lungs, his heart, and his aorta. The cause of death was massive hemorrhage. Dr. Huber did not recover a bullet during the autopsy and was unable to determine what caliber bullet had caused the fatal wound.
NOPD Officer Kenneth Leary was qualified by stipulation as an expert in the field of ballistics and firearms identification. Officer Leary testified that Det. Chambers asked him to compare six .40 caliber spent cartridge casings to a Taurus PT 140 .40 caliber semiautomatic pistol.[4] He determined that all six cartridges had been fired by that gun. He did not conduct any other firearms examination in the case. Officer Leary stated that no one had presented him any bullet taken from the body of the victim. He had no information as to whether a bullet from the firearm he had examined, or one from another gun, had killed Jamal Dorsey.

ERRORS PATENT

A review of the record reveals one patent error, which Mr. Weathersby also raises as his Assignment of Error No. 4. The record does not reflect that the trial court ruled on the defendant’s written motion to reconsider his manslaughter 18sentence, which was timely filed on November 2, 2011 — within thirty days following the October 21, 2011 sentencing. La.C.Cr.P. art. 881.1(A)(1).
The failure of a trial court to rule on a motion to reconsider sentence requires that the case be remanded for a ruling thereon, and that appellate review of a defendant’s sentence be deferred. State v. Augustine, 2013-0164, p. 11 (La. App. 4 Cir. 12/4/2013), 131 So.3d 109, 116; State v. Peters, 2010-0326, p. 4 (La.App. 4 Cir. 2/16/11), 60 So.3d 672, 675. However, the failure to rule on a motion to reconsider sentence does not preclude review of the conviction. Peters, supra; State v. Foster, 2002-0256, p. 3 (La.App. 4 Cir. 9/11/02), 828 So.2d 72, 74.

SUFFICIENCY OF THE EVIDENCE

In his first assignment of error, Mr. Weathersby argues that the evidence was insufficient to support his four convictions — one for manslaughter in the killing *267 of Jamal Dorsey, and three for aggravated battery in the shootings of Ashten Dorsey, Jamaal Jones, and Angelo Jackson.
When issues are raised on appeal as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. State v. Marcantel, 2000-1629, p. 8 (La.4/3/02), 815 So.2d 50, 55(citing State v. Hearold, 603 So.2d 731, 734 (La.1992)).
This court set forth the applicable standard of review for sufficiency of the evidence in State v. Huckabay, 2000-1082, p. 32 (La.App. 4 Cir. 2/6/02), 809 So.2d 1093, 1111, as follows:
In evaluating whether evidence is constitutionally sufficient to support a conviction, an appellate court must determine whether, |inviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Green, 588 So.2d 757 (La.App. 4 Cir.1991). However, the reviewing court may not disregard this duty simply because the record contains evidence that tends to support each fact necessary to constitute the crime. State v. Mussall, 523 So.2d 1305 (La.1988). The reviewing court must consider the record as a whole since that is what a rational trier of fact would do. If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier’s view of all the evidence most favorable to the prosecution must be adopted. The fact finder’s discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law. Mussall; Green; supra. “[Ajreviewing court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence.” State v. Smith, 600 So.2d 1319, 1324 (La.1992).
In addition, when circumstantial evidence forms the basis of the conviction, such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Shapiro, 431 So.2d 372 (La.1982). The elements must be proven such that every reasonable hypothesis of innocence is excluded. La. R.S. 15:438. This is not a separate test from Jackson v. Virginia, supra, but rather an evidentiary guideline to facilitate appellate review of whether a rational juror could have found a defendant guilty beyond a reasonable doubt. State v. Wright, 445 So.2d 1198 (La.1984). All evidence, direct and circumstantial, must meet the Jackson reasonable doubt standard. State v. Jacobs, 504 So.2d 817 (La.1987).
Huckaby, 2000-1082, p. 32, 809 So.2d at 1111 (quoting State v. Ragas, 98-0011, pp. 13-14 (La.App. 4 Cir. 7/28/99), 744 So.2d 99, 106-107).
The testimony of a single witness, if believed by the trier of fact, is sufficient to support a conviction. State v. Wells, 2010-1338, p. 5 (La. 4 Cir. 3/30/11), 64 So.3d 303, 306. A factfinder’s decision concerning the credibility of a witness will not be disturbed unless it is clearly contrary to the evidence. State v. James, 2009-1188, p. 4 (La.App. 4 Cir. 2/24/10), 32 So.3d 993, 996.
InMr. Weathersby was charged with second degree murder and convicted of manslaughter. Manslaughter is defined by La. R.S. 14:31 as:
(1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second de *268 gree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender’s blood had actually cooled, or that an average person’s blood would have cooled, at the time the offense was committed; or.... [5]
Second degree murder is defined in pertinent part as the killing of a human being “[w]hen the offender has a specific intent to kill or to inflict great bodily harm.” La. R.S. 14:30.1(A). Specific criminal intent is that state of mind which exits when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow from his act. La. R.S. 14:10(1). Specific intent can be formed in an instant. State v. McElveen, 2010-0172, p. 20 (La.App. 4 Cir. 9/28/11), 73 So.3d 1033, 1052 (citing State v. Cousan, 94-2503, p. 13 (La.11/25/96), 684 So.2d 382, 390).
The doctrine of “transferred intent,” an issue on which the trial court instructed the jury, provides that when a person shoots at an intended victim with the specific intent to kill or inflict great bodily harm and accidentally kills or inflicts great bodily harm upon another person, if the killing or inflicting of great bodily harm would have been unlawful against the intended victim, then it would be unlawful against the person actually/accidentally shot, even though that person was not the intended victim. State v. Ross, 2012-0109, pp. 8-9 (La.App. 4 Cir. 4/17/13), 115 So.3d 616, 621, writ denied, 2013-1079 (La.11/22/13), 126 So.3d 476; State v. Jordan, 97-1756, p. 16 (La.App. 4 Cir. 9/16/98), 719 So.2d 556, 567.
With regard to manslaughter, the terms “[sjudden passion” and “heat of blood” in La. R.S. 14:31(A)(1) are not elements of the offense; rather, they are mitigating factors in the nature of a defense which exhibit a degree of culpability less than that present when the homicide is committed in the absence of these factors. State v. Snyder, 98-1078, p. 4 (La.4/14/99), 750 So.2d 832, 837-838; State v. Thomas, 2011-1219, p. 19 (La.App. 4 Cir. 12/6/12), 106 So.3d 665, 677.
Mr. Weathersby was also convicted of three counts of aggravated battery. Aggravated battery is a battery committed with a dangerous weapon. La. R.S. 14:34(A). A battery is defined in pertinent part by La. R.S. 14:33 as “the intentional use of force or violence upon the person of another.” To convict a defendant of aggravated battery the State must prove that: (1) the defendant intentionally used force or violence against the victim; (2) the force or violence was inflicted with a dangerous weapon; and (3) the dangerous weapon was used in a manner calculated or likely to cause death or great bodily harm. La. R.S. 14:34; La. R.S. 14:2(A)(3); State v. Dussett, 2013-0116, p. 7 (La.App. 4 Cir. 10/2/13), 126 So.3d 593, 599. Aggravated battery is a crime requiring only general intent, meaning that the State need only prove the offender must have adverted to the prescribed criminal consequences as reasonably certain to result from his act or failure to act. State v. Stukes, 2008-1217, p. 13 (La.App. 4 Cir. 9/9/09), 19 So.3d 1233, 1242.
*269 |1sWith regard to his manslaughter conviction, Mr. Weathersby’s primary argument is that the State failed to show that he intentionally used force or violence against Mr. Dorsey. Mr. Weathersby additionally argues that the bullet that killed Mr. Dorsey was never analyzed to determine whether it could have been fired from Jamaal Jones’ gun. Defendant contends that “[a] spent bullet was recovered from the victim but was not tested or inspected to determine if it might have come from the gun of Jamaal Jones.”
However, there was no evidence that a bullet was recovered from Mr. Dorsey. According to Dr. Huber, who performed the autopsy, Jamal Dorsey suffered a single perforating gunshot wound from a bullet that entered his left chest and exited the right back. Dr. Huber testified that there was no bullet/pellet found inside the victim’s body; nor could she determine the caliber of the bullet that caused his death. It is true that NOPD firearms expert Kenneth Leary was shown a spent bullet collected from the sidewalk near 3010 Ameri-cus Street, but Officer Leary testified that he had never been asked to examine or analyze that bullet.
With regard to his aggravated battery convictions, Mr. Weathersby argues that the witnesses .for the State attempted to cover for their friend Jamaal Jones by failing to tell the investigating officers that Mr. Jones also had fired a gun. He further argues that the evidence showed he was not trying to kill or harm anyone by firing the gun; rather, he was attempting to fight and defend his friend Corey Willis. In support of this argument, Mr. Weath-ersby points out that when he shot, |14he fired in the direction of not just Jamal Dorsey and his group, but also in the direction of his own friends.
Despite Mr. Weathersby’s argument, however, only members of Mr. Dorsey’s group were shot in the incident. The testimony of Jamaal Jones, which was corroborated in several respects by members of both groups, was particularly informative. Mr. Jones said he was standing next to the defendant when he noticed movement and turned to see Mr. Weathersby raising a gun towards him. He ran but was shot, receiving the grazing wound.
Kristy Gatlin, who was with Mr. Weath-ersby’s group that night, testified that immediately before Mr. Weathersby exited his black Durango with a gun, another male had come to the black Durango saying there had been a big misunderstanding. This male presumably was Jamaal Jones, who testified that after the fight began, he knocked on the window of the black Durango, told Mr. Weathersby to get out and get his friend, and said that Mr. Weathersby was the reason they were out there. Ms. Gatlin denied that the male who had walked up to talk with Mr. Weathersby had a gun. While Mr. Jones did have a gun on his person, Ms. Gatlin’s testimony supports Mr. Jones’ assertion that his gun was in his pants at that time.
Corey Willis, one of Mr. Weathersby’s friends, testified that he heard about five or six gunshots while he and Jamal Dorsey were on the ground fighting. He then heard Mr. Weathersby telling him to get up, so he turned toward the house, intending to go inside. Mr. Willis said that, at that point he heard more gunshots, Incoming from the alley. He could see the muzzle flashes, but could not see who was firing. He said he then turned and ran back to Mr. Weathersby’s black Durango, and they left the scene. This sequencing of events by Corey Willis corroborates the testimony of Jamaal Jones that Mr. Weathersby shot first, at him, while both were standing in front of the black Duran-go, and that Mr. Jones fired back only *270 after running from the defendant and taking cover in an alley next to a residence.
Angelo Jackson testified that he and Ashten Dorsey were walking toward Jamal Dorsey trying to break up the fight when he heard a shot. Mr. Jackson said he looked to see the defendant turn toward him and point a gun at him. He said Mr. Weathersby was standing in front of the black Durango at that point. The defendant fired one shot at Jamaal Jones, then turned to Mr. Jackson, who ran to get around a gate. Mr. Jackson testified that Mr. Weathersby shot him twice, once in his elbow and once in his back. As Mr. Weathersby came his way, Mr. Jackson continued running, heard another shot over his head, and eventually reached the nearby home of his wife’s aunt. This testimony by Mr. Jackson, especially as to the sequencing of the shots fired, is consistent with that of Jamaal Jones and with the physical evidence at the scene. Det. Chambers testified that six 9mm spent cartridge casings were spread from the driveway between 3002 and 3010 Americus Street toward the victim’s body. A diagram in State Exhibit 4, NOPD Crime Lab Technician Tarez Cook’s crime scene report, depicts the very front end of the Dorseys’ white Durango being on Ameri-cus Street approximately halfway across |1fithis driveway The diagram shows one spent 9mm cartridge casing near the front of the white Durango, on the driver’s side, two others in the driveway, and three others on the lawn of 3002 Americus Street, where Mr. Dorsey’s body was discovered, two of those on the lawn being within approximately 10.4 inches of Mr. Dorsey’s feet, as depicted in the diagram. The defendant’s black Durango was described as being “nose-to-nose” with the Dorseys’ white Durango, and Jamaal Jones’ testimony was that the defendant began shooting while in front of the black Durango.
Jahlissa Wallace, who was with the Dorsey group, also corroborated Mr. Jones’ testimony with regard to where Mr. Weathersby was standing (between her and Jamaal Jones in front of the black Durango) when she saw out of the corner of her eye the defendant reach into and then out of his pocket. She then heard a shot, and saw Jamaal Jones run. She ran back to the rear passenger seat door and kind of ducked down, but she could still observe what was happening. She saw Mr. Weathersby, who had fired at Jamaal Jones, shooting into the crowd where his friends were and where Jamal Dorsey was — where the fight was going on. She said the gun was pointing toward the crowd, not in the air or at the ground. She said Jamaal Jones ran towards the back of some houses. This is consistent with Jamaal Jones’ testimony that the first shot the defendant fired was at him, and that he immediately ran into an alley next to a residence.
Dominique Smith, Mr. Weathersby’s girlfriend at the time of the shooting, testified that at the shooting scene, when Mr. Weathersby saw that Corey Willis l17was not going inside and that Jamal Dorsey kept moving toward Mr. Willis, he retrieved a gun from underneath his front seat and got out of the vehicle. Ms. Smith said the gun was in the defendant’s right hand. She heard gunshots coming from the alley. She did not see who shot first. When asked if the person in the alley was shooting “at you all,” Ms. Smith replied: “Yes. Shooting towards Chris [Mr. Weath-ersby].” This testimony is entirely consistent with Jamaal Jones’s testimony that he shot at the defendant only, and only after running to the alley.
Troylynn Curtis Jackson, who was with the Dorsey group, testified that she did not see who was shooting at any time. Ashten Dorsey testified that she only re *271 called that the shooter was heavyset, had a fade hairstyle, and was shooting from in front of the black Dodge Durango. She said the shooter got back into the black Durango and fled.
The evidence was consistent from all witnesses that the Dorsey group and the defendant’s group first interacted in a negative way at the bowling alley. The lights went out inside, and Corey Willis began horsing around and sending bowling balls down their alley, including at least one he retrieved from the lane being used by the Dorsey group. The evidence was consistent that this incident was resolved, and that both groups resumed bowling. It is also undisputed that the defendant pulled his black Durango alongside of the Dorsey group as they walked to their car outside of the bowling alley and said something about the incident. Corey Willis, the defendant’s friend, confirmed that Mr. Weathersby felt like Mr. Dorsey had disrespected him; that the defendant did not want Mr. Dorsey to think he had |is“punked out or chumped out;” and so Mr. Weathersby waited to see if Mr. Dorsey wanted to fight when he came out of the bowling alley.
It is undisputed that after leaving the bowling alley, both groups eventually drove back across the Mississippi River to the Algiers section of New Orleans, where they would once again meet in the 3000 block of Americus Street. Both Mr. Weathersby and Jamal Dorsey exhibited, at some point after leaving the bowling alley, an urge to fight, or at least to continue the argument begun in the bowling alley. Eventually, it was Jamal Dorsey and Corey Willis who fought. There is no evidence that either Mr. Dorsey or Mr. Willis had a weapon; they were fist-fighting. While Mr. Willis indicated that he and Jamal Dorsey had fallen to the ground and that Mr. Dorsey was on top of him when he heard the first shot, Mr. Willis did not testify that he felt he had then been in imminent danger of great bodily harm or death.
Notably, while Mr. Weathersby argues on appeal that in firing six shots he was not trying to kill or harm anyone, but only attempting to stop the fight and defend his friend, he makes no legal argument that his use of such force and violence was justified in defense of Corey Willis as provided for in La. R.S. 14:22.[6] Further, Mr. Weathersby does not argue that the evidence was insufficient to establish that the killing of Jamal Dorsey was committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average |19person of his self-control and cool reflection. Rather, the defendant’s contention is not that he shot Jamal Dorsey and the others in sudden passion or heat of blood, but that he was not aiming at anyone in particular and was simply shooting to break up the fight. While the evidence establishes that Mr. Weathersby was in a fighting mood that evening, it also indicates that immediately prior to the shooting, he was in control of himself, standing there watching the fighting with Jahlissa Wallace and Jamaal Jones.
Viewing all the evidence in a light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that it was Mr. Weath-ersby who shot Jamal Dorsey, Angelo Jackson, Ashten Dorsey, and Jamaal Jones; that in doing so he specifically in *272 tended to kill or inflict great bodily harm on those four victims; and that he used his gun in a manner calculated or likely to cause death or great bodily harm.
Thus, viewing all the evidence in a light most favorable to the prosecution, any rational trier of fact could have found all the elements of the offenses of manslaughter and aggravated battery present beyond a reasonable doubt. We find no merit to this assignment of error.

DENIAL OF MOTION FOR NEW TRIAL

In his second assignment of error, Mr. Weathersby argues that the trial court erred by denying his motion for a new trial, which was based upon the assertion that the State had failed to disclose to defense counsel “open” or “pending” charges against Jamal Dorsey and Ashten Dorsey related to their arrest for possession of lanfive to fifty pounds of marijuana in Texas on February 14, 2009, and “as a consequence the defendant was unable to effectively cross state witnesses.”
The specific statutory grounds cited by defendant in his motion for new trial, under La.C.Cr.P. art. 851(3), (4), and (5) are:
(3) New and material evidence that, notwithstanding the exercise of reasonable diligence by the defendant, was not discovered before or during the trial, is available, and if the evidence had been introduced at the trial it would probably have changed the verdict or judgment of guilty;
(4) The defendant has discovered, since the verdict or judgment of guilty, a prejudicial error or defect in the proceedings that, notwithstanding the exercise of reasonable diligence by the defendant, was not discovered before the verdict or judgment; or
(5) The court is of the opinion that the ends of justice would be served by the granting of a new trial, although the defendant may not be entitled to a new trial as a matter of strict legal right.
In order to obtain a new trial based on newly discovered evidence, the defendant must show: (1) the new evidence was discovered after trial; (2) the failure to discover the evidence at the time of trial was not due to the defendant’s lack of diligence; (3) the evidence is material to the issues at trial; and (4) the evidence is of such a nature that it would probably have changed the verdict of guilty. La. C.Cr.P. art. 851(3); State v. Brisban, 2000-3437, p. 12 (La.2/26/02), 809 So.2d 923, 931; State v. Lindsey, 2012-1195, p. 13 (La.App. 4 Cir. 11/20/13), 129 So.3d 759, 767. A trial court assessing the legal merits of a motion for new trial is given considerable latitude in evaluating the reliability of the evidence and its impact on the verdict. State v. Taylor, 2012-0114, p. 12 (La.App. 4 Cir. 11/28/12), 104 So.3d 679, 687, writ denied, 2012-2599 (La.5/3/13), 113 So.3d 211. A trial court’s ruling on a motion for new trial will not be disturbed on appeal absent a clear showing of abuse of discretion. State v. Quimby, 419 So.2d 951, 960 (La.1982).
During defense counsel’s cross examination of the last of the State’s witnesses, Jamaal Jones, counsel asked Mr. Jones whether he knew about Jamal Dorsey’s “case” in Texas. Mr. Jones said he did. When defense counsel questioned: “Thirty pounds of weed?”, Mr. Jones stated that it had not been thirty pounds of weed. When defense counsel asked him how many pounds of marijuana it had been, the State objected to defense counsel getting into the “facts of — ,” whereupon the trial court directed defense counsel to move on. Defense counsel persisted, twice asking Mr. Jones if he had been with Mr. Dorsey on the case in Texas, to which Mr. Jones twice replied in the negative. Defense *273 counsel asked Mr. Jones who had told him about the Texas case, and Mr. Jones replied that Mr. Dorsey had told him. Defense counsel again asked who had had told him about it, but the State again objected, and the trial court directed counsel to move onto something else. Mr. Weathersby does not allege any trial court error with regard to these rulings effectively sustaining the State’s objections and barring defense counsel from questioning Jamaal Jones any further on the issue of Jamal Dorsey’s arrest in Texas.
Mr. Weathersby timely filed a motion for new trial, and a hearing was held prior to sentencing. At the hearing, defense counsel represented that he had not learned of the Texas arrest until the last day of trial when an attorney sitting in the | ¡^courtroom mentioned to defense counsel’s paralegal that he believed Jamal Dorsey had gotten arrested in Texas. Defense counsel then introduced documents evidencing the arrests of both Ashten and Jamal Dorsey for possession of five to fifty pounds of marijuana on February 14, 2009 in Harris County, Texas, which defense counsel said he had obtained after trial. The documents also contain a copy of an April 21, 2009, motion to dismiss the criminal action as to Jamal Dorsey for the stated reason that he was deceased. In addition, one of the documents, dated May 14, 2009, is an order from a Harris County District Court judge commanding the Harris County Sheriff to discharge Ashten Dorsey from custody because the grand jury investigated the case against her and failed to issue an indictment. Thus, the charges against both Jamal Dorsey and Ashten Dorsey were dismissed approximately two years prior to the trial in the instant case.
Defendant argues, as he did in support of his motion for new trial, that had he timely received this information concerning the Texas arrests, he would have been entitled to cross examine Ashten Dorsey as to whether she expected to receive or had received any assistance of leniency with regard to the “pending” felony drug charge in Texas, and to cross examine key State witnesses about the character of the decedent, Jamal Dorsey, using this marijuana arrest. We reject this argument.
La. C.E. art. 609.1(A) provides that in a criminal case, every witness who testifies thereby subjects himself to examination relative to his criminal convictions. La. C.E. art. 609.1(B) states that “[generally, only offenses for which bathe witness has been convicted are admissible upon the issue of his credibility, and no inquiry is permitted into matters for which there has only been an arrest, the issuance of an arrest warrant, an indictment, a prosecution, or an acquittal.” Nevertheless, the use of the word “generally” in La. C.E. art. 609.1(B) may allow the use of arrests, indictments and the like where independently relevant, for example, to show bias.” See George Pugh, Robert Force, Gerard Rault & Kerry Triche, Handbook on Louisiana Evidence Law, Authors’ Note (2), La. C.E. art. 609.1, p. 563 (2013).
A witness’s bias or interest may arise from arrests or pending criminal charges, or the prospect of prosecution, even where he has made no agreements with the State regarding his conduct. State v. Sparks, 88-0017, p. 67 (La.5/11/11), 68 So.3d 435, 486; State v. Joyner, 2011-1397, pp. 34-35 (La.App. 4 Cir. 10/24/12), 107 So.3d 675, 695, writ denied, 2012-2494 (La.5/31/13), 118 So.3d 388; see also State v. Rankin, 465 So.2d 679, 681 (La.1985) (“The possibility that the prosecution may have leverage over a witness due to that witness’ [s] pending criminal charges is recognized as a valid area of cross-examination.”)
*274 The defendant also cited State v. Harrison, 484 So.2d 882, 884 (La.App. 1 Cir. 1986), in his trial court memorandum for the proposition that criminal charges are considered to be “pending” if the time limitations for the institution of prosecution have not elapsed, although the charges have been disposed of. However, State v. Harrison is inapplicable to the present case because Mr. Weathersby did not furnish, in connection with his motion for new trial, any 1 ^statutory law concerning the Texas time limitation for the institution of prosecution for the offense of possession of five to fifty pounds of marijuana, the offense at issue for which Ms. Ashten was arrested in Texas. Moreover, it is obvious that Ms. Dorsey’s interest in testifying against Mr. Weathersby was to aid in convicting the individual whom she no doubt believed had wrongly shot and killed her husband. Accordingly, the defendant has failed to show any evidence that Ms. Dorsey was biased or that her motive in testifying was to gain some advantage with regard to pending charges against her in Texas.
Mr. Weathersby also contends he could have used evidence concerning Jamal Dorsey’s Texas marijuana arrest to cross examine key State witnesses about Mr. Dorsey’s character and thereby rebut testimony by these witnesses that Mr. Dorsey was a good person or denials by them that Mr. Dorsey was a “gangster” or gang member, as defense counsel repeatedly insinuated. However, the only ground Mr. Weathersby cites for using the evidence in such a manner is La. C.E. art. 608(C), which states:
A witness who has testified to the character for truthfulness or untruthfulness of another witness may be cross examined as to whether he has heard about particular acts of that witness bearing upon his credibility.
This article does not apply to the cross examination of a witness concerning the victim’s character, for which purpose defendant cites it, but rather, refers to the cross examination of a witness who has testified to the character for truthfulness or untruthfulness of another witness.
|gsIt is undisputed that the State never notified defendant of the Dorseys’ Texas arrests. Even accepting that conclusive actual evidence of the Dorseys’ Texas arrests was not discovered by defense counsel until after trial, notwithstanding the exercise of reasonable diligence by the defendant, the trial court would not have abused its discretion by concluding that the evidence of the Texas arrests was not material to the issues at trial or, more importantly, that this evidence was not of such a nature that it would probably have changed the verdict of guilty. Therefore, the trial court did not abuse its discretion in denying Mr. Weathersby’s motion for new trial insofar as it was based on La. C.Cr.P. art. 851(3) — the discovery of new and material evidence.
The second ground asserted for defendant’s motion for new trial was the discovery since the verdict of a prejudicial error in the proceedings, as per La.C.Cr.P. art. 851(4). Defendant’s claim that the State violated its obligation under Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196-97, 10 L.Ed.2d 215 (1963) to turn over evidence favorable to him, that being evidence of the Dorsey’s February 14, 2009 arrests in Texas for possession of five to fifty pounds of marijuana, would fall under this provision.
The Louisiana Supreme Court set forth the applicable law on the State’s duty to disclose evidence favorable to the accused in State v. Bright, 2002-2793, pp. 5-6 (La.5/25/04), 875 So.2d 37, 41—42; as follows:
*275 In Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196-97, 10 L.Ed.2d 215 (1963), the United States Supreme Court held that suppression by the prosecution of evidence favorable to the accused after receiving a request for the evidence violates a defendant’s due | ^process rights where the evidence is material either to guilt or punishment, without regard to the good or bad faith of the prosecution. For purposes of the State’s due process duty to disclose, no difference exists between exculpatory evidence and impeachment evidence. State v. Kemp, 00-2228, p. 7 (La.10/15/02), 828 So.2d 540, 545. The Brady rule encompasses evidence which impeaches the testimony of a witness when the reliability or credibility of that witness may determine guilt or innocence. United States v. Bagley, 473 U.S. 667, 676, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985); State v. Knapper, 579 So.2d 956, 959 (La.1991).
Nevertheless, it is important to note that Brady and its progeny do not establish a general rule of discoverability, and not every case in which it is discovered post-trial that favorable evidence was withheld by the State will result in a reversal of the conviction. A prosecutor does not breach any constitutional duty to disclose favorable evidence unless the “omission is of sufficient significance to result in the denial of the defendant’s right to a fair trial.” United States v. Agurs, 427 U.S. 97, 108, 96 S.Ct. 2392, 2400, 49 L.Ed.2d 342 (1976). For purposes of Brady’s due process rule, a reviewing court determining materiality must ascertain:
not whether the defendant, would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial re-suiting in a verdict worthy of confidence. [Emphasis supplied.]
Kyles v. Whitley, 514 U.S. 419, 434, 115 S.Ct. 1555, 1566, 131 L.Ed.2d 490 (1995). See also, State v. Strickland, 94-0025, p. 38 (La.11/1/96), 683 So.2d 218, 234. Thus, the reviewing court does not put the withheld evidence to an outcome-determinative test in which it weighs the probabilities that the petitioner would have obtained an acquittal at trial or might do so at a second trial. Instead, a Brady violation occurs when the “evidentiary suppression ‘undermines confidence in the outcome of the trial.’ ” Kyles, 514 U.S. at 434, 115 S.Ct. at 1566 (quoting Bagley, 473 U.S. at 678, 105 S.Ct. at 3381).
As previously noted, it is undisputed that the State did not notify Mr. Weath-ersby of the February 2009 Texas arrest of Jamal and Ashten Dorsey for possession of marijuana. The State did not deny at the hearing on the motion for new trial that it knew of Jamal Dorsey’s arrest in Texas prior to the trial.
However, even assuming the State did know of the Dorseys’ Texas arrests | 27prior to trial and failed to furnish that information to the defendant, the State’s failure to divulge the information did not undermine confidence in the outcome of the trial or deny defendant his right to a fair trial. Thus, the trial court did not abuse its discretion by denying defendant’s motion for a new trial on the Brady issue.
The final ground asserted by Mr. Weathersby in his motion for new trial, under La.C.Cr.P. art. 851(5), was that the ends of justice would be served by the granting of a new trial, although he may not have been entitled to a new trial as a matter of legal right. A trial court “is vested with almost unlimited discretion” in ruling on a motion for new trial on the ground of serving the ends of justice, and *276 its decision granting or denying such motion should not be disturbed absent a “palpable” abuse of that discretion. State v. Guillory, 2010-1231, pp. 4-5 (La.10/8/10), 45 So.3d 612, 615. Considering the evidence presented, the verdicts rendered in this case clearly do not fall short of serving the ends of justice.
There is no merit to this assignment of error.

EXCESSIVENESS OF MANSLAUGHTER SENTENCE

In his final assignment of error, Mr. Weathersby argues that his thirty-year sentence for manslaughter is unconstitutionally excessive. However, as previously noted in the error patent discussion, we are precluded from addressing this assignment of error because, insofar as the record shows, the trial court failed to rule on the defendant’s timely-filed motion to reconsider his sentence for manslaughter.

12RDECREE

For the foregoing reasons, Mr. Weath-ersby’s conviction of manslaughter and his three convictions of aggravated battery are affirmed; his three sentences for aggravated battery are affirmed; and this matter is remanded to the trial court for a ruling on the defendant’s motion to reconsider his sentence for manslaughter, reserving to him the right to appeal that sentence should his motion to reconsider be denied.
CONVICTIONS AFFIRMED; SENTENCES AFFIRMED IN PART; REMANDED.

. All the aforementioned people, except for the defendant and Sheena Carruth, testified at trial.

. The record indicates that the fight occurred during the early morning hours of March 1, 2009.

. Ms. Gatlin's first name is spelled as both ''Christi” and "Kristi” in the trial transcript. However, Ms. Gatlin’s name is spelled as "Kristy” in State Exhibit 20, the arrest warrant and application therefor for Ms. Gatlin’s arrest.

. The gun turned in by Jamaal Jones

. Section (2) of the manslaughter statute is not pertinent to this discussion because the jury was instructed only as to the above-quoted definition provided in La. R.S. 14:31(1).

. La. R.S. 14:22 states:
It is justifiable to use force or violence or to kill in the defense of another person when it is reasonably apparent that the person attacked could have justifiably used such means himself, and when it is reasonably believed that such intervention is necessary to protect the other person.